(No. 87134.

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. SANANTONE MOSS, Appellant.

*Opinion filed October 18, 2001.—Rehearing denied February 4, 2002.*

McMORROW, J., specially concurring.

FREEMAN, J., joined by KILBRIDE, J., concurring in part and dissenting in part.

HARRISON, C.J., and KILBRIDE, J., dissenting.

Charles M. Schiedel, Deputy Defender, and Kathryn Saltmarsh, Assistant Defender, of the Office of the State Appellate Defender, of Springfield, for appellant.

James E. Ryan, Attorney General, of Springfield, and Richard A. Devine, State's Attorney, of Chicago (William L. Browers, Assistant Attorney General, of Chicago, and Renee Goldfarb and William L. Toffenetti, Assistant State's Attorneys, of counsel), for the People.

JUSTICE GARMAN delivered the opinion of the court:

Following a jury trial in the circuit court of Cook County, defendant was convicted on two counts of first degree murder for the deaths of his ex-girlfriend, Emma Renee Jones (Renee), and her 11-year-old daughter, Diandra Jones. The same jury found defendant eligible for the death penalty and found no mitigating factors sufficient to preclude its imposition. The circuit court sentenced defendant to death. Defendant appeals his convictions and death sentence directly to this court. 134 Ill. 2d R. 603. For the reasons that follow, we affirm the judgment of the circuit court.

## BACKGROUND

The murders of Diandra and Renee occurred in November 1991, while defendant was incarcerated and awaiting trial on charges that he sexually assaulted Diandra. Subsequent to the murders, the State proceeded to trial on the alleged sexual assault. Defendant was convicted of aggravated criminal sexual assault and

sentenced to 60 years' imprisonment. In connection with the murders, defendant was initially charged with four counts of first degree murder (Ill. Rev. Stat. 1989, ch. 38, pars. 9—1(a)(1), (a)(2)), two counts of conspiracy to commit first degree murder (Ill. Rev. Stat. 1991, ch. 38, par. 8—2(a)), two counts of solicitation of murder (Ill. Rev. Stat. 1991, ch. 38, par. 8—1.1(a)), and one count of intimidation (Ill. Rev. Stat. 1991, ch. 38, pars. 12—6(a)(1), (a)(3)). The State nol-prossed all charges except those for first degree murder. Defendant's mother, Sandra Major, his aunt, Danita Best, and his sister, Kerrie Major, were also charged with the murders. Sandra died of natural causes while awaiting trial. Danita pled guilty to first degree murder and agreed to testify against defendant in exchange for a sentence of natural life. Kerrie was found guilty after a bench trial and received a sentence of natural life.

At defendant's murder trial, his sister, Orvette Davis, testified that defendant telephoned her collect several times while he was incarcerated during the fall of 1991. In a September 1991 conversation, defendant asked her to "get rid of" Diandra and Renee because he did not want them to testify at his upcoming sexual assault trial. He did not want to "get the boot," meaning the electric chair. Defendant made the same request in October 1991, which Orvette understood as a request to kill Diandra and Renee. Orvette refused to help her brother. She told Danita Best about defendant's first request.

Danita Best testified that she was also charged with the murders of Diandra and Renee. She pleaded guilty and agreed to testify against defendant in exchange for a sentence of natural life. Danita had approximately 15 telephone conversations with defendant from August to November 1991. Danita accepted defendant's collect phone calls in Sandra Major's apartment, where Danita lived at the time. During their first conversation in

August 1991, defendant told Danita that he wanted her to help Sandra "get rid of" Diandra and Renee so they could not testify against him. Danita understood this to mean that defendant wanted them killed. She told defendant that she could not help him because she was on parole after a conviction for voluntary manslaughter and theft. Defendant threatened that if she did not, the same thing that had happened to one of his girlfriends would happen to her. Danita thought he was referring to a woman named Cora whom defendant had beaten on the head with a hammer. Danita believed that she needed to do as she was told or something would happen to her. In the past, defendant had attempted to throw her out of a ninth-floor window. However, she testified that she did not decide to participate in the murders until the day they occurred. Defendant reiterated during their remaining conversations that Danita had to help Sandra get rid of Diandra and Renee because of the upcoming trial. Danita believed that defendant's requests were serious.

Danita further testified that Diandra and Renee lived in an apartment below Sandra's. On November 22, 1991, the date of the murders, Sandra told Danita to get cocaine from her room, mix it with rat poison, and go to Renee's apartment and let her smoke the mixture. When Renee was "knocked out," they were going to kill her. Danita mixed the cocaine and poison; she then went to the store at Sandra's request to buy cigarettes, gin, and wine. Danita brought these items to Renee's apartment. Renee and her children, 13-year-old Matthew, 11-year-old Diandra, and 2-year-old Troy, were in the apartment. Later in the evening, Matthew left to go to a friend's house. Renee attempted to smoke the cocaine but it would not burn. Danita returned to her apartment where Sandra gave her more cocaine that was not laced with rat poison. Back in Renee's apartment, Danita and Renee began drinking and smoking the cocaine. In time, Sandra and Kerrie Major joined them.

When the cocaine ran out, Kerrie and Renee left the apartment to buy more. Once they left, at Sandra's instruction, Danita retrieved a knife from the kitchen, went to the couch where Diandra was sleeping, and stabbed her in the chest, neck, and upper face several times until she was dead. Sandra stood over Danita and told her to make sure that Diandra was dead. When Renee and Kerrie returned, Renee did not realize that Diandra was dead because her body had been covered with a blanket to make it appear as though she was still sleeping. Shortly thereafter, Sandra gestured to Danita that it was time to kill Renee. Sandra and Kerrie wrapped a cord from an iron around Renee's neck and began choking her. Danita started stabbing Renee in the upper part of her chest, and in her throat and face. Danita stated that she stabbed Renee "[t]hirty, forty, a lot of times." Renee pleaded with Sandra that she would not testify, but Sandra told her it was too late. Kerrie then broke a wine bottle over Renee's face and began stabbing her with it and with a screwdriver.

According to Danita, although Renee's youngest son, Troy, was in the apartment at the time of the murders, his life was spared because Sandra thought he was defendant's son and her grandson. After Renee was dead, Sandra told Kerrie and Danita to gather up the bottles, glass, and sheets. Sandra left the apartment and returned shortly with her husband, James Patterson. At some point, defendant's sister Cecelia joined them. Sandra told Cecelia to take the glass and knives to her apartment. The bodies were loaded into Patterson's car; then Sandra, Patterson, Danita, Kerrie, and Cecelia drove to an empty lot and discarded the bodies. They left Troy next to a garbage can in an alley near a hospital. On their way home, they stopped to buy gin and cigarettes.

Upon returning to her apartment, Sandra instructed her daughter Rosaline to take their clothes to the laun-

dromat. The day after the murders, Sandra told Danita to stay at Patterson's house for awhile because Matthew could place her at the crime scene on the day of the murders. Danita complied. About one week later, Danita flagged down a police officer on the street and told him that she had witnessed a murder. In her testimony, Danita acknowledged that she first lied to the police about her involvement in the murders but stated that she eventually confessed.

On cross-examination, Danita admitted that she made numerous false statements to the police regarding the events of November 22, 1991. In several statements, Danita told the police that she did not take part in the murders and fabricated several persons that were involved. Later, in a written statement, Danita admitted that she was involved in the crime but minimized her level of participation. Ultimately, she acknowledged to the police the extent of her involvement and implicated defendant for the first time in a court-reported statement. The defense attorney further elicited that Danita had been smoking cocaine for three days prior to the murders and that she believed her life depended on whether her testimony made "the prosecutors happy."

Eliza Warner, Renee's mother, testified that on the morning of November 23, 1991, she tried to telephone her daughter. When no one answered, she went to her daughter's apartment. She entered the apartment with her key and noticed that all the windows were open and the television was on but no one was home. In the back bedroom, she discovered blood on the floor, the walls, draperies, and clothing. She also found a bloody screwdriver. Eliza left the apartment and went to a neighbor's apartment to call the police.

Matthew Warner testified that on the evening of November 22, 1991, he left his mother's apartment around 10 p.m. to spend the night at a friend's house.

Danita Best had been at the apartment on that day. The following morning, Matthew had been expecting a phone call from his mother to let him know when to return home. When she did not call, Matthew went home and learned that his mother and sister were missing.

Daniel Pierce testified that on the morning of November 23, 1991, he heard a car stop abruptly by the window of his apartment. The car door opened and he heard some rumbling near a garbage can outside the window. The car then sped away. Pierce heard whimpering and crying outside the window. He went outside and found a baby boy later identified as Troy Jones.

Detective Guy Habiak testified that on the morning after the murders, he was called to Renee's apartment to investigate a missing persons incident. Upon entering the apartment, he observed a large amount of blood on the couch, a trail of blood leading to a bedroom, and blood spattering on the walls, drapes, and mattress covers. He also noticed a broken bottle and a bloody screwdriver. The following day, he was called to a location where two bodies were found. The bodies were later identified as Renee and Diandra. Habiak also learned during his investigation that a child was discovered in an alley the day after the murder.

Habiak further testified that he personally interviewed Danita three times. Danita gave several statements to investigators, including a handwritten statement. She later admitted that parts of her statements were untrue. Danita gave a court-reported statement on December 6, 1991. Subsequent to this statement, Danita was charged with two counts of first degree murder.

Dr. Edmond Donoghue testified that he performed an autopsy on Diandra and Renee. Donoghue noted that there were over 74 evidences of injury on Renee's body, including 29 stab wounds to the face and 10 stab wounds to the chest that were deep and entered body cavities or

involved vital organs. Diandra's body contained 22 evidences of injury.

The State entered into evidence the telephone records of Orvette Davis and Sandra Major. Both records contained several collect telephone calls from the Cook County jail from August to November 1991.

The only evidence presented by the defense was the autopsy protocol for the body of Fred Herndon, Jr., who was killed by Danita in 1996. The report showed that the body had suffered 30 stab wounds.

The jury found defendant guilty of the first degree murders of Diandra and Renee Jones. At the first stage of defendant's sentencing hearing, the jury considered the evidence presented at trial. In addition, the State presented evidence that defendant's date of birth was August 10, 1966, and Diandra's date of birth was February 21, 1980. The jury returned three separate eligibility verdicts. The jury found defendant eligible for the death penalty based on the statutory aggravating factors of multiple murder, brutal and heinous murder of a child under 12, and murder to prevent an individual from testifying in a criminal prosecution. Ill. Rev. Stat. 1989, ch. 38, pars. 9—1(b)(3), (b)(7), (b)(8).

At the second stage of sentencing, the State presented evidence of defendant's criminal history. This included evidence that defendant had been adjudicated delinquent for the offense of robbery in 1982 and was sentenced to the Department of Corrections. In 1985, defendant was convicted of battery and received supervision. In August 1985, defendant was arrested for aggravated arson but was released. In January 1986, he was again convicted of battery and served two days in the Cook County Department of Corrections. Additionally, he was arrested in May 1986 for threatening to kill his girlfriend, Magnolia Williams, and threatening to set her apartment on fire.

The State presented the testimony of Alvina Ander-

son. On April 30, 1987, while outside her house, defendant came up to Anderson, put a knife to her back, and told her that if she moved he would kill her. Defendant took Anderson up the street and in between two buildings. There he beat and raped her. Defendant threatened that if she told anyone, he would kill her and her mother, father, and sister. He then raped Anderson again. She was 15 at the time. After he was finished, defendant robbed her of $1.50. Defendant plead guilty to aggravated criminal sexual assault and armed robbery. He was sentenced to six years' imprisonment.

Magnolia Williams was unavailable to testify at defendant's sentencing hearing. The State, however, read into the record her testimony from defendant's 1992 aggravated criminal sexual assault sentencing hearing. There, Williams testified that she had a relationship with defendant for eight years. In 1987, after defendant learned that Williams wanted to end the relationship, he butted her in the face with his head, took a sharpened screwdriver, and stabbed her in the arm three times and once in the chest. Williams further testified that, during their relationship, defendant "brutally beat" her. She remained in the relationship because there "was no way out." Defendant was convicted of aggravated battery and was sentenced to five years' imprisonment to be served consecutively to the six-year sentence already imposed for the aggravated criminal sexual assault and armed robbery of Alvina Anderson.

The State presented further evidence that, while defendant was incarcerated from 1988 to 1990, he received 25 disciplinary tickets. These included tickets for insolence, intimidation, and threats. During his incarceration from 1992 to 1994, defendant received 19 disciplinary tickets, including tickets for assault. Defendant was charged with bribery and extortion while in prison. In addition, during a routine search of his cell, of-

ficers found a homemade knife. As a result, defendant was charged with possession of dangerous contraband.

Rosaline Major, defendant's sister, testified that when she was seven or eight, defendant began fondling her and repeatedly forced her to have sex. Defendant threatened to hurt her if she told anyone. Rosaline further testified that defendant was physically abusive to her. The sexual abuse ended when Rosaline was 14 after she told her mother who, in response, put defendant out of the house "for a couple of hours."

Orvette Davis testified that when she was 12 years old, defendant held a fork to her neck, threatened to kill her, and then raped her. At the time of the rape, her sisters were in the apartment. Orvette did not tell her sisters about the rape because "they already knew what was happening." Defendant raped her again when she was 14. Orvette told her mother about the incident, but Sandra said nothing. Later, when Orvette asked her mother why she did not do anything, her mother responded that "[defendant] just got a little problem."

Cecelia Major testified that, during her childhood, defendant repeatedly raped her at gunpoint or knifepoint and threatened to kill her if she told anyone. She eventually told her mother about the rape, but her mother did nothing. Cecelia further testified that she had witnessed defendant hit Magnolia Williams in the head with a bed rail and, on another occasion, stab Williams with an ice pick. Cecelia also witnessed defendant beat and push a man named Booker Singleton through a ninth-story window and threaten to drop him.

In conclusion, the State entered into evidence a certified copy of defendant's conviction and sentence for the aggravated criminal sexual assault of Diandra Jones, and presented the victim impact statements of Doyle Warner, Renee's brother, Eliza Warner, and Matthew Warner.

In mitigation, defendant presented the testimony of

Sarah Hodges, the sister of Magnolia Williams. She stated that defendant had voluntarily agreed to terminate his parental rights to his two children.

Dr. Daniel Hardy, a psychiatrist, testified for the defense that he had diagnosed defendant with schizo-affective disorder of the bipolar type that is aggravated or caused by a history of brain injury. This disorder is comprised of paranoia and bipolar mood disorder. Tests revealed that defendant had frontal and temporal lobe abnormalities in his brain. The frontal and temporal lobes govern judgment and impulse control respectively. Hardy opined that defendant has suffered for many years from a significant condition that has resulted in extreme emotional and mental disturbance.

Dr. Jonathan Pincus was qualified as an expert in neurology. Pincus interviewed defendant and reviewed various records and reports regarding defendant's condition. He testified that defendant was psychotic and exhibited signs of paranoia and delusional behavior. A physical examination revealed that defendant had frontal lobe abnormalities.

The jury found no mitigating factors sufficient to preclude the imposition of the death penalty, and the circuit court sentenced defendant to death based on his first degree murder convictions. Defendant's death sentence was stayed by this court pending direct review. 134 Ill. 2d R. 609(a).

## ANALYSIS

### I. Trial

Prior to defendant's trial, the State filed a motion "to allow proof of other crimes evidence." This motion sought to introduce certain evidence of the December 2, 1990, sexual assault of Diandra to establish defendant's motive in ordering his family to kill Diandra and Renee. Over defendant's objection, the circuit court granted the

motion. Subsequently, defendant filed a motion *in limine* to bar as hearsay out-of-court statements made by Diandra regarding the alleged sexual assault. The State had indicated that it would introduce Diandra's statements through the testimony of four witnesses. The circuit court rejected defendant's motion.

The State introduced the following evidence regarding the alleged sexual assault at defendant's murder trial.

Matthew Warner testified that on the afternoon of December 2, 1990, he was at home baby-sitting his younger brother and sister while his mother was at a neighbor's apartment. Around 12 p.m., defendant came by the apartment to sleep off a hangover. Later on, defendant asked Matthew to do some push-ups and told Matthew to change his clothes so he could do the exercises better. Matthew went to his bedroom to change; when he returned to the living room, he noticed that Diandra was "abnormally quiet" and did not want to be near defendant. Diandra asked defendant to leave several times. Defendant replied that he would leave if Diandra would get his jacket and cigarette lighter from the back room. Diandra tried to find the items without success. Defendant told her to try again, and this time "really look." When Diandra was again searching for the items, defendant announced that he would get his own things. About 20 minutes later, Diandra came running from the back of the apartment with defendant chasing her. Matthew testified that Diandra was hysterical and scared; she was screaming for defendant to leave her alone. Diandra ran to the front door but defendant put one foot against the bottom of the door and one hand against the door. Diandra started screaming for her mother. At some point, her mother forced her way into the apartment and Diandra exclaimed that defendant had tried to have sex with her. When her mother asked her to repeat what she had said, Diandra stated: "he tried to have sex with me."

Renee then told defendant to leave and subsequently called the police.

Matthew further testified that after defendant left, Diandra went to the bathroom and called out for her mother. Matthew later learned that Diandra had shown her mother some "white stuff" that she had found.

Officer Steve Martin testified that he responded to a criminal sexual assault call on December 2, 1990. He arrived at Renee's apartment and spoke directly with Diandra. She informed him that defendant took her to a back room of the apartment, removed her clothing, and threw her on a bed. Defendant then removed his clothing and had sexual intercourse with her. Diandra told Martin that she broke free and tried to get out of the apartment. She struggled with defendant at the front door and, eventually, her mother pushed open the door. Diandra immediately told her mother about what had happened. Martin testified that Diandra was shaking and scared when she spoke with him.

The physician who examined Diandra after the sexual assault, Dr. Kinga Jokay, testified that Diandra informed her that defendant had coaxed her into a room, undressed her below the waist, undressed himself, and attempted to have sex with her. Diandra stated that defendant had not placed his penis into her vagina, but he had rubbed himself on her and ejaculated. Due to this information, Jokay did not conduct an internal examination. An external examination revealed a dried white secretion, consistent with sperm, on the inner part of Diandra's thighs and external genitalia. Jokay's medical opinion was that Diandra had been sexually assaulted.

Finally, the State presented the testimony of Lieutenant Edward Griffin, who, along with another detective, interviewed Diandra at the hospital. Diandra told Griffin that, as soon as her mother left for the neighbor's apartment, defendant began to ask her questions about sex.

Defendant asked her if she had "whiskers" on her vagina. He also asked if he was making her uncomfortable and if she wanted him to leave. Diandra answered yes. Defendant said he would leave if Diandra brought him his jacket and cigarette lighter from the rear bedroom. She did this and defendant followed her to the bedroom, where he forced her onto the bed, removed her clothes, and had intercourse with her. When he was finished, Diandra tried to leave the apartment but defendant stopped her. While she was struggling with defendant, Diandra's mother pushed open the door of the apartment. While Griffin was interviewing Diandra, she appeared very nervous, frightened, and apprehensive.

### A. *Evidence of Another Crime*

We begin by addressing defendant's contention that the circuit court erred by admitting evidence of another crime. Evidence of other crimes is inadmissible if it is relevant merely to show a defendant's propensity to commit crime. *People v. Kliner*, 185 Ill. 2d 81, 146 (1998). However, this evidence may be properly admitted when it is relevant to prove a defendant's motive to commit the crime for which he is being tried. *People v. Enis*, 163 Ill. 2d 367, 388 (1994). The circuit judge must weigh the probative value of the evidence against its prejudicial effect, and may exclude the evidence if its prejudicial effect substantially outweighs its probative value. *People v. Illgen*, 145 Ill. 2d 353, 365 (1991). A circuit court's ruling on the admissibility of other-crimes evidence will not be disturbed absent an abuse of discretion. *Kliner*, 185 Ill. 2d at 146.

Defendant acknowledges that the testimony pertaining to the alleged sexual assault was admissible to establish his motive; however, he maintains that the circuit court failed to weigh the probative value of the evidence against its prejudicial effect. He further argues that the evidence should have been limited. Motive could

have been established simply by informing the jury of his conviction for aggravated criminal sexual assault or that he was awaiting trial on the sexual assault at the time of the murders. Alternatively, the court should have limited the number of witnesses on this issue as each witness established the same facts. According to defendant, this testimony prejudiced him because it focused the jury's attention on the alleged sexual assault and away from the State's evidence on his involvement in the murders. This prejudice was compounded by the use of the word "rape" throughout the trial to refer to the sexual assault.

The State responds that its theory of the case was that defendant was awaiting trial on the sexual assault charges at the time of the murder. Defendant feared that the evidence against him was sufficient to convict; therefore, he solicited his family to kill the principal witnesses against him. The State argues that the four witnesses demonstrated the strength of the State's sexual assault case and the fact that much of its case depended upon Diandra. The witnesses established the consistency of Diandra's story, her credibility as a witness, and, as such, defendant's motive to prevent her from testifying.

As stated, the admissibility of other-crimes evidence is within the discretion of the circuit court. Contrary to defendant's argument, the circuit court *did* weigh the probative value of this evidence against its prejudicial effect. In ruling on the State's pretrial motion to allow proof of other crimes, the court explicitly stated that the evidence would not unduly prejudice defendant. Both parties acknowledge that this evidence was relevant and probative of defendant's motive. Although motive could have been established in the way suggested by defendant, the method chosen by the State and approved by the circuit court was within the court's discretion. We agree that the testimony established the consistency of Dian-

dra's description of the events of the sexual assault, and, with the exception of Matthew Warner, the testimony was primarily limited to this description. Also, the prejudicial effect of the evidence was minimized when the trial court properly instructed the jury as to the limited purpose of other-crimes evidence. See Illinois Pattern Jury Instructions, Criminal, No. 3.14 (3d ed. 1992). We find that the probative value of the evidence was not substantially outweighed by its prejudice. The circuit court did not abuse its discretion in admitting this evidence under the circumstances of this case.

Defendant further contends that the prejudice of the testimony was compounded by the use of the word "rape" to refer to the alleged sexual assault. The circuit court originally sustained a defense objection to the use of the word. The court apparently changed its decision after the State argued the word was admissible under section 115—11.1 of the Code of Criminal Procedure of 1963 (Code). This section provides that the use of the word "rape" "by any victim, witness, State's Attorney, defense attorney, judge or other court personnel in any prosecutions of offenses in Sections 12—13 through 12—16 of the Criminal Code of 1961, as amended, is *not inadmissible*." (Emphasis added.) 725 ILCS 5/115—11.1 (West 1998). Defendant is correct that first degree murder is not one of the crimes listed in section 115—11.1; however, this fact is not dispositive. Section 115—11.1, by specifically allowing the use of the word "rape" in certain prosecutions, does not thereby limit its use in other prosecutions. We conclude that the use of this word did not result in prejudice to defendant.

### B. *Admission of Diandra's Statements*

With respect to the testimony regarding the alleged sexual assault, defendant also argues that the circuit court erred by admitting, through this testimony, several out-of-court statements made by Diandra. In his motion

*in limine*, defendant argued that the witnesses' statements were hearsay and were not admissible under any exception to the hearsay rule. The circuit court rejected defendant's argument and allowed the testimony pursuant to section 115—10 of the Code, which provides in relevant part:

"(a) In a prosecution for a physical or sexual act perpetrated upon or against a child under the age of 13, *** including but not limited to prosecutions for violations of Sections 12—13 through 12—16 of the Criminal Code of 1961 and [various other sections] of the Criminal Code of 1961, the following evidence shall be admitted as an exception to the hearsay rule:

***

(2) testimony of an out of court statement made by such child *** describing any complaint of such act or matter or detail pertaining to any act which is an element of an offense which is the subject of a prosecution for a sexual or physical act perpetrated upon or against a child ***." 725 ILCS 5/115—10(a)(2) (West 1996).

Here, defendant argues that the circuit court erroneously allowed this testimony pursuant to section 115—10 of the Code. Defendant maintains that section 115—10 provides an exception to the hearsay rule only in sexual assault cases; therefore, this testimony was improperly admitted at his murder trial. The State disagrees, arguing that the testimony was admissible under the section 115—10 exception and certain statements were admissible under traditional or other statutory hearsay exceptions. We need not resolve this question because we conclude that the testimony was not hearsay.

Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. *People v. Heard*, 187 Ill. 2d 36, 65 (1999). When an out-of-court statement is offered for some purpose other than to establish the truth of the matter asserted, the statement is not hearsay and is admissible. *Kliner*, 185 Ill. 2d at 150. As stated, the

State's theory was that defendant ordered members of his family to murder the victims to prevent them from testifying at his upcoming sexual assault trial. Both Danita Best and Orvette Davis testified that defendant called them collect while he was incarcerated and either asked or told them to "get rid of" Diandra and Renee so they could not testify. As such, Diandra's out-of-court statements concerning the alleged sexual assault were not offered to prove that the sexual assault actually occurred; they were offered to prove defendant's motive. Accordingly, since Diandra's out-of-court statements were not offered to prove the truth of the matter asserted, defendant's argument that the statements were improperly admitted as hearsay must be rejected. See *United States v. Levine*, 5 F.3d 1100, 1107 (7th Cir. 1993) (testimony of out-of-court statements indicating that defendant stole from murder victims was not hearsay because it was offered to prove defendant's motive for hiring a hit man and not to prove the matters asserted in the statements); *Heard*, 187 Ill. 2d at 66 (testimony offered to prove defendant's motive to commit murder was not offered for the truth of the matter asserted). In addition, we reiterate that the probative value of this testimony was not substantially outweighed by its prejudicial effect.

### C. *Sufficiency of the Evidence*

Defendant next contends that the evidence was insufficient to establish his accountability for the murders of Diandra and Renee. Defendant was convicted of first degree murder pursuant to section 5—2 of the Criminal Code of 1961 (hereinafter Code), which provides, in pertinent part, that "[a] person is legally accountable for the conduct of another when *** [e]ither before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the

planning or commission of the offense." Ill. Rev. Stat. 1991, ch. 38, par. 5—2(c). The State maintains that defendant's act of solicitation of murder made him legally accountable for the completed murders. According to section 8—1.1 of the Code, a person commits solicitation of murder "when, with the intent that the offense of first degree murder be committed, he commands, encourages or requests another to commit that offense." Ill. Rev. Stat. 1991, ch. 38, par. 8—1.1(a). Defendant points out that he was initially charged with solicitation of murder but that charge was nol-prossed prior to trial.

Defendant's argument can be divided into two parts. First, he maintains that section 5—2(c) of the Code requires more than the unilateral act of requesting, commanding, or encouraging another to commit a crime; it requires evidence of an agreement or an act on the part of a defendant that evidences a common plan or scheme. Second, he argues that the State failed to produce evidence of an agreement or a common scheme or plan; consequently, the State failed to prove that defendant was accountable for the murders. We understand defendant's first argument to be that solicitation within the meaning of section 5—2(c) of the Code concerning accountability differs from the type of solicitation found in section 8—1.1(a) of the Code concerning the inchoate offense of solicitation of murder. Thus, defendant is arguing that the jury could not hold him legally accountable for the murders based on the inchoate offense of solicitation of murder. Because this issue raises a legal question, our review is *de novo*. *Kleinwort Benson North America, Inc. v. Quantum Financial Services, Inc.*, 181 Ill. 2d 214, 218 (1998).

In support of his argument, defendant relies on certain language found in *People v. Hairston*, 46 Ill. 2d 348 (1970). In *Hairston*, the accused was charged with murder, attempted murder, and solicitation to commit

murder. The State sought to convict the defendant of murder and attempted murder on an accountability theory based solely on the allegation that the defendant solicited another to kill the victim. *Hairston*, 46 Ill. 2d at 355-56. The defendant was acquitted of the murder and attempted murder charges, but he was found guilty of solicitation to commit murder. *Hairston*, 46 Ill. 2d at 356. On appeal to this court, the defendant maintained that, because the proof necessary to convict him of the principal crimes was identical with the proof necessary to convict him of solicitation, the verdicts were inconsistent and he was placed in double jeopardy. *Hairston*, 46 Ill. 2d at 357. This court rejected the defendant's argument.

In addressing the defendant's double jeopardy argument, we held that because the defendant was tried for the charges of murder, attempted murder, and solicitation of murder in a single prosecution, the defendant was not twice placed in jeopardy. *Hairston*, 46 Ill. 2d at 357. Following this conclusion, we explained that the proof necessary to obtain a conviction for solicitation and the proof necessary to obtain convictions for the principal crimes were not identical:

> "The crimes charged, *viz.* solicitation on the one hand and murder and attempted murder on the other hand, were separate and distinct crimes predicated upon different statutes, even though both arose out of the same act of defendant. But whereas proof that defendant had commanded or requested the principal crimes with the requisite intent was all that was necessary to establish his guilt of the crimes of solicitation[,] to establish his guilt of the principal crimes it was necessary to prove the additional fact that the principal crimes had in fact been committed." *Hairston*, 46 Ill. 2d at 359.

In support of his argument, defendant relies on language immediately following the above passage. This language reads:

> "While the use of the word 'solicit' in the accountability

statute would appear to be grammatically out of harmony with its purport, we are constrained to remark that section 5—2 (accountability) and section 8—1 (solicitation) relate to different conduct and as a consequence entail different elements of proof. Section 5—2, in its full context, contemplates an accessorial act which 'promotes' or 'facilitates' another person in 'the planning or commission' of an offense; section 8—1, on the other hand, encompasses only conduct whereby an accused 'commands, encourages or requests another' to commit an offense." *Hairston*, 46 Ill. 2d at 359.

Defendant urges this court to adopt the distinction drawn in *Hairston* and hold that accountability requires more than the unilateral act of commanding, encouraging, or requesting another to commit a crime. Defendant maintains that a review of cases in which the accused was found accountable by means of solicitation reveal that the accused must take a "step beyond" the solicitation. See, *e.g.*, *People v. Smith*, 177 Ill. 2d 53, 63-64 (1997) (defendant solicited the murder, participated in the acquisition of the murder weapon, and provided her car to the principals); *People v. Smith*, 278 Ill. App. 3d 343, 347 (1996) (incarcerated defendant solicited a murder and lured the victim to the location of the attempted murder by instructing the victim to go there to pick up money); *People v. Martinez*, 264 Ill. App. 3d 807, 815-16 (1994) (incarcerated defendant solicited a murder and provided a telephone number to the principal in the event the principal could not locate a gun).

Defendant's argument is unpersuasive. Nothing in the cited cases suggests that an act of solicitation alone, as defined in section 8—1.1, is insufficient to establish accountability. Further, we conclude that the explanation in *Hairston* is *dictum*. See *People v. Crews*, 191 Ill. App. 3d 228, 233 (1989). Even so, in that *dictum*, this court made it clear that the only additional fact necessary to establish accountability beyond the act of solicitation is the fact that the principal crimes had been committed.

*Hairston*, 46 Ill. 2d at 359. The plain language of section 5—2(c) clearly states that a person may be held legally accountable for the conduct of another if he *"solicits, aids, abets, agrees or attempts to aid"* another in the planning or commission of the offense. (Emphasis added.) (Ill. Rev. Stat. 1991, ch. 38, par. 5—2(c)). Legislative intent is best determined by examining the plain and ordinary meaning of the statutory language, and, if that language is clear, we apply the statute without further aids of statutory construction. *Lucas v. Lakin*, 175 Ill. 2d 166, 171 (1997). We reject defendant's first contention and hold that a person may be held legally accountable for first degree murder if he, either before or during the commission of an offense, and with the requisite intent, commands, encourages, or requests another to commit the offense of first degree murder. See also 2 W. LaFave & A. Scott, Substantive Criminal Law § 6.1, at 14 (1986) ("it is generally true that if A solicits B to commit a crime and B then proceeds to commit the crime in response to A's solicitation, then A is liable as an accomplice for the crime which B has committed").

We must now address the second part of defendant's argument—that the evidence was insufficient to hold him legally accountable for the murders. When a defendant challenges the sufficiency of the evidence supporting his conviction, a reviewing court must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Young*, 128 Ill. 2d 1, 49 (1989), citing *Jackson v. Virginia*, 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789 (1979). It is the function of the jury to assess the credibility of witnesses, weigh the evidence presented, resolve conflicts in the evidence, and draw reasonable inferences from the evidence. *People v. Williams*, 193 Ill. 2d 306, 338 (2000).

The jury's determination is entitled to great deference and, when the sufficiency of the evidence is challenged, this court will not retry the defendant. *People v. Boclair*, 129 Ill. 2d 458, 474 (1989). We will not reverse a defendant's conviction unless the evidence is so improbable or unsatisfactory that it raises a reasonable doubt of defendant's guilt. *Williams*, 193 Ill. 2d at 338.

After a review of the record in the light most favorable to the prosecution, we conclude that a rational trier of fact could have found beyond a reasonable doubt that defendant was accountable for Diandra's and Renee's murders. Evidence presented at trial indicated that defendant called Orvette Davis and Danita Best collect several times while he was incarcerated. Telephone records were introduced to corroborate this testimony. Defendant asked Orvette on two separate occasions to "get rid of" the victims. He made the same request of Danita during a number of phone conversations. Danita testified that defendant's requests were serious. As a result, Danita, along with Kerrie Major and Sandra Major, murdered Diandra and Renee. We hold that the evidence supports the jury's guilty verdict.

Defendant further challenges the sufficiency of the evidence on the grounds that the testimony of Danita Best lacked credibility in that she was contradicted with four pretrial statements in which she lied repeatedly; she had a strong motive to lie because she believed she had to please the prosecution to save her own life; she was a drug addict; she had previously been convicted of manslaughter; and because Orvette's testimony that defendant did not ask Orvette to participate in the murders after she refused casts doubts on Danita's statements that defendant repeatedly solicited her to kill the victims after her own refusal.

The jury in this case was fully aware of Danita's drug use and prior conviction. The jury was also cognizant of

Danita's plea agreement with the State where, in exchange for a plea of guilty and testimony against defendant, the State would seek natural life. The court fully instructed the jury that the testimony of an accomplice is subject to suspicion and should be considered with caution. See Illinois Pattern Jury Instructions, Criminal, No. 3.17 (3d ed. 1992). Further, on cross-examination, defendant elicited the details of Danita's prior statements to the police and Danita admitted that she lied in those statements. Finally, we believe that Orvette's testimony corroborates rather than casts doubt on Danita's statements as suggested by defendant. Certainly, the jury had in front of it all this information. It was in the best position to weigh the evidence and to determine the credibility of Danita Best. We will not substitute our judgment for that of the jury on questions involving the credibility of witnesses. Accordingly, defendant's contention that the evidence was insufficient to establish his guilt beyond a reasonable doubt is without merit.

### D. *Closing Arguments*

Next, defendant claims that the cumulative effect of several improper statements made by the prosecutor during closing argument deprived him of a fair trial. First, at the outset of his closing argument, the prosecutor commented:

> "[L]ittle Matthew Warner could not know on December 2nd, of 1990[,] that that was the beginning of the end for his sister and for his mother. And he could not know in December of 1990, when the defendant got locked up for the rape of his sister that no one in the Jones family would be safe from [defendant]. And he could not know that on November 22, of 1991, when he left home that night at about 10[p.m.] that he would never see his sister and his mother again."

In his rebuttal argument, the prosecutor further commented on the victims' family and stated: "Mrs. Warner[,]

who no longer has a daughter or a granddaughter. Matthew and Troy no longer have a mother and a sister. Now, thank God Troy was so young back then because he can't remember what happened that night. Thank God."

Defendant also maintains that the following remark deprived him of a fair trial:

"[T]he defendant has had his trial. The defendant doesn't have one, he's got [three] lawyers and he's got a Judge who has protected his rights every step of the way. Who protected [Diandra and Renee's] rights? How come they couldn't get a trial? The defendant and his evil family violated every one of their rights. And *** every prosecutor in this courtroom, in this building, in this state, we can't tell our reluctant witnesses, don't worry about it any more. [objection overruled] He caused that. But I don't want you to do it for any prosecutor, ladies and gentlemen, I don't want you to do the right thing for any prosecutor in this country. I want you to do it, ladies and gentlemen, for [Renee] and Diandra. Ladies and gentlemen, you are in a unique position right now. You and only you can give [Renee] and Diandra the only thing they wanted. A chance to be heard. Your verdicts can be their testimony. You can speak for them. Today is their day in Court. Today is their day in Court. Give it to them. Give them their day in Court. If you don't speak for [them], no one will. And they will forever be silenced. Don't let that happen. You speak for them. And you say [it] with one word, you say it with guilty."

Finally, the prosecutor made the following comment regarding Diandra's thwarted day in court:

"[She] would have woken up and put on her suit, her mother would have helped her put her little pigtails in her hair, put the bows on her pigtails [objection overruled] [a]nd come down to the courthouse and she would have squared her shoulders, taken a deep breath and walked into the courtroom of Judge Schreier holding her mother's hand. She would have gone up on that witness stand, her feet barely touching the floor. She would have raised her right [hand] and [objection overruled] swore to tell the truth, the whole truth and nothing but the truth. She

would have pointed to that man right there [objection overruled] [a]nd said that's the man who raped me and her mother would have done the same. But because of that man, he made sure neither she nor her mother would ever get the chance to do that. He made sure that neither she nor her mother would ever walk into a Court of law. He made sure, he made sure that Diandra Jones would never lace her shoes up again, never square her shoulders and never ever walk out that door into a Court of law to tell the truth about what happened on December 2, of 1990."

Defendant does not dispute that he failed to object to the first three of these statements and thereby waived these issues for review. Nonetheless, he urges this court to review the statements under the plain error rule. The State, however, argues that defendant has waived review of *all* the statements. We agree. To preserve an issue for review, a defendant must raise an objection at trial and in a written post-trial motion. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). While defendant objected to the last comment at trial, his written post-trial motion alleged generally that the prosecutor "made prejudicial[,] inflammatory[,] and erroneous statements in closing argument designed to arouse the prejudices and passions of the court." Defendant's general allegation of error is insufficient to preserve this issue for review. See *People v. Simpson*, 172 Ill. 2d 117, 150 (1996).

The plain error rule serves as an exception to the rule of waiver. 134 Ill. 2d R. 615(a). Plain error exists only if (1) the evidence is closely balanced; or (2) the errors are of such magnitude that defendant was denied a fair and impartial trial and remedying the error is necessary to preserve the integrity of the judicial process. *People v. Nieves*, 192 Ill. 2d 487, 502-03 (2000). Defendant makes no effort to argue that the evidence at his trial was closely balanced nor does he maintain the alleged errors were so fundamental that they denied him a fair and impartial trial. This failure results in waiver. See *Nieves*, 192 Ill. 2d at 503. Although defendant has twice

waived this argument, we conclude that no plain error resulted from the prosecutor's comments. As our discussion of defendant's sufficiency of the evidence argument demonstrates, the evidence in this case was not closely balanced. Further, these comments did not rise to the level whereby defendant was denied a fair and impartial trial. Accordingly, defendant's arguments are without merit.

## II. Sentencing

We now turn to defendant's assertions of error at the sentencing proceedings.

### A. *Prosecutors' Comments*

Similar to the preceding argument, defendant contends that certain comments made by the prosecutors during the aggravation/mitigation stage of sentencing were improper and inflammatory and denied him a fair sentencing hearing. During his testimony, Dr. Daniel Hardy attempted to locate a reference in his notes. The prosecutor commented: "So again you have to search through your records, you don't know this, do you, off the top of your head?" Defendant's objection was overruled. The following dialogue, to which defendant did not object, then occurred:

"Q. Would it be correct, Doctor, the longer it takes you to look through the records the more money you're going to make here today?

A. The longer I'm on the witness stand, yes.

Q. Okay. So the answer to that question would be yes?

THE COURT: He answered it.

\* \* \*

THE COURT: Move on."

Next, after Hardy stated his diagnosis that frontal lobe abnormality was a factor in defendant's behavior, the prosecutor asked: "Are you actually telling us that [defendant's] criminality is caused by some boo-boo to the head?" The court admonished the prosecutor to "stop that."

Additionally, in closing arguments, the prosecutor urged the jury to weigh the evidence in aggravation against a "boo-boo to the brain." "[W]e heard about [defendant's] problems, *** we've heard about his medication, we've heard about his brain ad nauseum from psycho-babble that went on and on and on." "When you consider all [the evidence in aggravation] and you weigh it against those [two] cash for trash doctors ***, you'll see that there are no mitigating factors sufficient to preclude imposition of the death penalty."

In rebuttal argument, a different prosecutor stated: "[Defendant] has the audacity to suggest to you that we, the People of the State of Illinois[,] are doing the same thing now that he did behind his jail cell. You know, I don't care about a criminal defense lawyer trying to insult me, but don't let him insult you. Because he's suggesting to you that you're killing him now too. Shame on him." The prosecutor went on to say that "[g]iving him natural life is an American Express Gold Card for this defendant to assault correctional officers, prison staff, cafeteria workers, possessing shanks, sharpened to a point to stab anybody who makes him angry."

Again, defendant failed to object to all but the first of these comments at trial and did not include an objection to any of the comments in his post-trial motion, thereby waiving review of the issue. *Enoch*, 122 Ill. 2d at 186. In his argument, defendant does not acknowledge his waiver, nor does he request this court to address the issue under the plain error rule. Therefore, we conclude that defendant has waived any challenge to these remarks. This conclusion should not be interpreted in any way as condoning improper prosecutorial remarks that have become all too frequent in criminal trials. The prosecutor's use of sarcasm to describe Dr. Hardy's diagnosis as a "boo-boo to the head" and reference to both expert witnesses as "cash for trash doctors" is

completely unacceptable. Although a new trial is not always a necessary sanction for improper remarks of a prosecutor, comments denigrating defendant's witnesses must be strongly condemned.

B. *Danita Best's and Kerrie Major's Sentences*

Defendant also contends that his death sentence is unconstitutionally disproportionate to the natural life sentences of his codefendants Danita Best and Kerrie Major. In support, defendant claims that both Danita and Kerrie are more culpable than he because they physically stabbed the victims and actively participated in the cover-up while his role in the murders was minimal.

A disparity in the sentences of codefendants does not, by itself, show a violation of fundamental fairness. To be impermissible, the disparity must be arbitrary and unreasonable. *People v. Caballero*, 179 Ill. 2d 205, 216 (1997). In comparing the sentences, this court considers the nature of the offense, each individual's relative involvement, character, background, criminal record, and potential for rehabilitation. *People v. Burt*, 168 Ill. 2d 49, 80 (1995).

Defendant has not established an unconstitutional disparity with respect to either Danita's or Kerrie's sentence. Danita pleaded guilty and agreed to testify against defendant in exchange for natural life. A sentence imposed pursuant to a plea of guilty does not provide a valid basis of comparison to a sentence imposed subsequent to trial and conviction. *Caballero*, 179 Ill. 2d at 217. A court may grant dispositional concessions to defendants who enter a guilty plea when the public's interest in the effective administration of justice would thereby be served. *People v. Sivels*, 60 Ill. 2d 102, 105 (1975). By pleading guilty and testifying against defendant in exchange for a sentence of natural life, Danita (1) acknowledged her guilt; (2) made a public trial unnecessary; and (3) gave cooperation which resulted in the

successful prosecution of another offender engaged in equally serious or more serious criminal conduct. See *Sivels*, 60 Ill. 2d at 105.

With respect to Kerrie Major, defendant argues only that his sentence is unconstitutionally disproportionate because Kerrie is more culpable for the murders. He does not provide this court with evidence or argument regarding Kerrie's character, background, criminal record, or potential for rehabilitation. While Kerrie did actively participate in the murders, defendant could not participate because he was incarcerated at the time the murders took place. Nevertheless, the murders would not have occurred but for defendant's solicitation of them. Additionally, the evidence presented at defendant's sentencing hearing indicates that defendant has a significant criminal record, including convictions for battery, aggravated battery, aggravated criminal sexual assault, and armed robbery. The evidence showed that defendant had repeatedly raped three of his sisters, beat his former girlfriend, and pushed a man through a ninth-story window. Further, defendant adjusted poorly to incarceration as evidenced by his possession of weapons and his receipt of 44 disciplinary tickets while in prison. Based on this evidence, we reject defendant's contention that his death sentence is unconstitutionally disproportionate to the sentence of natural life imposed on Kerrie Major.

### C. *Death Penalty Eligibility Based on Accountability*

Defendant next challenges the constitutionality of section 9—1(b)(7) of the Code as applied to him on the basis of accountability. That section provides for death penalty eligibility if "the murdered individual was under 12 years of age and the death resulted from exceptionally brutal or heinous behavior indicative of wanton cruelty." Ill. Rev. Stat. 1989, ch. 38, par. 9—1(b)(7). Defendant argues that sentencing him to death based on the manner in which other individuals carried out the killing

violates the eighth amendment's guarantee of individualized consideration of the defendant's culpability.

The jury found defendant eligible for the death penalty under three separate aggravating factors. " '[W]here a defendant is found eligible based upon two or more statutory aggravating factors, the fact that one of those factors may later be invalidated will not generally impair the eligibility finding as long as a separate, valid aggravating factor supported eligibility.' " *People v. Jackson*, 182 Ill. 2d 30, 64 (1998), quoting *People v. Brown*, 169 Ill. 2d 132, 165 (1996); see also *People v. Cole*, 172 Ill. 2d 85, 102-03 (1996). Even if we did invalidate defendant's eligibility verdict based on the brutal or heinous murder of a child under 12, defendant would continue to be eligible for the death penalty based on the multiple-murder and murder to prevent an individual from testifying in a criminal prosecution aggravating factors.

### D. *Constitutionality of Illinois Death Penalty*

Finally, defendant makes four constitutional challenges to the Illinois death penalty statute. This court has previously considered and rejected the challenges raised by defendant, including his arguments that the death penalty statute (1) will inevitably be applied to innocent persons (see, *e.g., People v. McCallister*, 193 Ill. 2d 63, 114 (2000); *People v. Brown*, 185 Ill. 2d 229, 260 (1998); *People v. Bull*, 185 Ill. 2d 179, 211-20 (1998)); (2) places a burden of proof on defendants that precludes meaningful consideration of mitigation (see, *e.g., Williams*, 193 Ill. 2d at 376; *Nieves*, 192 Ill. 2d at 504; *Bull*, 185 Ill. 2d at 220; (3) allows the sentencer to weigh the vague aggravating factor of "any other reason" why a defendant should be sentenced to death (see, *e.g., People v. Sims*, 192 Ill. 2d 592, 637-38 (2000); *People v. Nielson*, 187 Ill. 2d 271, 300 (1999); *People v. Buss*, 187 Ill. 2d 144, 248 (1999)); and (4) does not sufficiently minimize

the risk of arbitrarily or capriciously imposed death sentences (*People v. Armstrong*, 183 Ill. 2d 130, 162 (1998)). Defendant provides no persuasive reason for our reconsideration of these holdings.

## CONCLUSION

For the foregoing reasons, the judgment of the circuit court is affirmed. We direct the clerk of this court to enter an order setting Wednesday, January 30, 2002, as the date on which the sentence of death, entered by the circuit court of Cook County, shall be carried out. Defendant shall be executed in the manner provided by law. 725 ILCS 5/119—5 (West 1996). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, the warden of Tamms Correctional Center, and the warden of the institution where defendant is confined.

*Affirmed.*

JUSTICE McMORROW, specially concurring:

I join Justice Freeman's opinion to the extent it holds that customary plain error analysis should be applied to defendant's arguments concerning prosecutorial misconduct at trial and sentencing.

Also, like Justice Freeman, I believe that the remarks made by the prosecutors during closing argument at defendant's sentencing hearing must be strongly rebuked. Capital sentencing proceedings impose upon the jury the intellectually and emotionally demanding task of determining whether or not a defendant is eligible for and deserving of death, the most severe of all state-sanctioned punishments. In such a proceeding, where the outcome is literally a matter of life or death, there can be no place for sarcasm or improper name-calling. The matter is far too portentous, and the risk that the jury might be swayed by passion or prejudice is far too real, to conclude otherwise.

Given the horrific nature of capital offenses, it is understandable that a prosecutor's emotions may run high. But, "[n]o matter how deplorable the crime in issue or how inadequate the defense theories may be perceived by the prosecution, the larger policies of fair trial and proper courtroom decorum inveigh against the type of prosecutorial remarks and conduct that occurred here. Such behavior benefits no one, not the people of Illinois who are represented by the prosecutor, not the victim's families, and certainly not the individuals whose sole transgression was to give testimony on behalf of the defense." *People v. Kidd*, 175 Ill. 2d 1, 58 (McMorrow, J., specially concurring, joined by Freeman, J.).

The prosecutorial remarks in this case were unprofessional and debased the sentencing proceeding. Nevertheless, having carefully considered the remarks in the context of the entire proceeding, I am constrained to conclude that the comments do not rise to the level of plain error. Thus, I join the majority in holding that defendant's death sentence should not be disturbed. I emphasize, however, my strong disapproval of the remarks at issue in this case. I caution prosecutors not to make these comments again, and I urge judges to vigorously guard against such unprofessional conduct.

JUSTICE FREEMAN, concurring in part and dissenting in part:

I respectfully concur in part and dissent in part from today's decision.

With respect to the issues raised by defendant concerning the guilt phase of his trial, I agree with my colleagues in the majority that the convictions must be affirmed. I do take issue, however, with the analysis used to resolve defendant's argument concerning the propriety of the prosecution's closing argument at this phase of the trial. Defendant maintains that the prosecutors engaged in improper argument during the closing of the guilt

phase of the trial. The court holds, correctly, that the issue was waived because it was not properly preserved. The court then states that defendant "urges this court to review the statements under the plain error rule." 205 Ill. 2d at 168. After noting the plain error exception to the waiver rule, the court observes:

"Defendant makes no effort to argue that the evidence at his trial was closely balanced nor does he maintain the alleged errors were so fundamental that they denied him a fair and impartial trial." 205 Ill. 2d at 168.

The court concludes that defendant's failure to so argue results in waiver. 205 Ill. 2d at 168.

Our plain error doctrine is based upon Supreme Court Rule 615(a), which provides the following:

"Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded. Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." 134 Ill. 2d R. 615(a).

We have consistently interpreted Rule 615(a) to allow a court of review to consider those errors that have not been properly preserved when (i) the evidence is closely balanced or (ii) the purported error is of such magnitude so as to deny the defendant a fair and impartial trial. *People v. Vargas*, 174 Ill. 2d 355, 363 (1996) (and cases cited therein.). If one of these prongs is met, the procedural default is excused.

The court's determination that defendant "makes no effort" to argue plain error results from the narrow and restrictive reading the court accords to defendant's briefs. On page 47 of his opening brief, defendant invokes this court's Rule 615(a), which, as noted above, is the plain error rule. Defendant then goes on to cite cases that he believes support his view that the argument deprived him a fair and impartial trial. Defendant further contends that the State's closing argument was designed to "divert the jury's attention from the weakness of the State's murder case." Defendant also maintains on page 50 of

his brief that another comment also served "to muddy the waters because the evidence against [defendant] was so weak and their key witness was so completely lacking in credibility." Defendant reasserts these same arguments in his reply brief. In light of these contentions, I cannot join the court in its summary conclusion that defendant has made "no effort" to demonstrate plain error. Defendant is clearly arguing that (i) the evidence of his guilt was weak, and (ii) the errors were of such a nature so as to deprive him of a fair and impartial trial. For these reasons, I do not believe that defendant has, in any way, "twice waived this argument."

Our precedent dictates that, unless plain error exists by which to excuse a procedural default, the bar must be honored. *People v. Keene*, 169 Ill. 2d 1, 17 (1995). I have reviewed the remarks defendant claims were improper and find no reason to excuse the procedural default. The evidence adduced at the guilt phase of the trial was not closely balanced, as the court correctly notes. Moreover, none of the complained of remarks were of the nature to undermine the fairness of the guilt phase of the trial. In all other respects, I join in the court's opinion as to the guilt phase of defendant's trial.

Notwithstanding my agreement that defendant's convictions must be affirmed, I am unable to join in the court's disposition of defendant's argument concerning remarks made by the prosecution during closing argument at the death sentence hearing. I, therefore, respectfully dissent from that portion of today's opinion.

Defendant maintains that certain comments made by the prosecutors during the aggravation/mitigation stage of his death sentencing hearing were improper and inflammatory and denied him a fair sentencing hearing. In resolving the issue, the court notes that defendant failed to object to most of the comments and did not include the issue in his post-trial motion. As a result, the

court holds that the issue is precluded from review on appeal. 205 Ill. 2d at 170. The court states that defendant failed to acknowledge his procedural default and failed to request that the court address the issue under the plain error rule. 205 Ill. 2d at 170. Accordingly, the court concludes:

> "[d]efendant has waived any challenge to these remarks. This conclusion should not be interpreted in any way as condoning improper prosecutorial remarks that have become all too frequent in criminal trials. The prosecutor's use of sarcasm to describe Dr. Hardy's diagnosis as a 'boo-boo to the head' and reference to both expert witnesses as 'cash for trash doctors' is completely unacceptable. Although a new trial is not always a necessary sanction for improper remarks of a prosecutor, comments denigrating defendant's witnesses must be strongly condemned." 205 Ill. 2d at 170-71.

Thus, the court holds that defendant's failure to argue plain error in his brief precludes review. Although purporting not to address the issue, the court takes the position that, while the prosecutor's use of sarcasm was "completely unacceptable," a new trial is not a proper sanction in this case. I strongly disagree with the court's approach to this issue for several reasons.

As an initial matter, the court again, as it did in addressing the guilt phase improper argument issue, takes defendant to task for failing to define just how the defaulted error constitutes "plain" error. This happens because, once again, the court reads the briefs much too narrowly and much too restrictively. In his opening brief, defendant argues that several remarks made in closing arguments by the prosecutors during the aggravation-mitigation phase of the sentencing hearing were improper and necessitated reversal. I note that, in so doing, defendant cites to at least one case in which this court held that comments similar to those at issue in this case constituted plain error. *People v. Holman*, 103 Ill. 2d 133 (1984). Therefore, it appears to me that defendant has,

in fact, couched his presentation in terms of plain error. I believe that the better approach to this issue is for the court to address the argument under the traditional plain error analysis that I noted in the foregoing section of this separate opinion.

Additionally, I do not understand why, after having concluded that defendant's failure to invoke the plain error doctrine results in a waiver of the issue, the court feels compelled to assert that its "conclusion [that the issue is waived] should not be interpreted in any way as condoning improper prosecutorial remarks that have become all too frequent in criminal trials" (205 Ill. 2d at 170) or that comments denigrating a defendant's witnesses "must be strongly condemned" (205 Ill. 2d at 171). If the issue has been waived due to deficiencies in briefing (see 155 Ill. 2d R. 341(e)(7)), then I do not see the point in making these statements. The reason for this seemingly contradictory treatment is that the court wants to have it both ways. The court takes this approach in order to "send the message" that the type of conduct that occurred in this trial should not really be tolerated. This approach, however, will not serve as a substitute for addressing the argument in depth because this court has sent these types of "messages" before. See *People v. Kidd*, 175 Ill. 2d 1 (1996). Our past "messages" appear to go unheeded as this case more than amply demonstrates. I am further troubled by the fact that the court's handling of this issue does nothing that would serve to diminish the likelihood of such conduct from recurring in our courtrooms. In fact, I see quite the contrary: Today's opinion reveals that this court (i) will not concern itself with improper argument in the courtroom if a defendant's brief does not conform with the court's own notions of an articulate argument and (ii) will not, even in the face of conduct that is, by the court's own admission, both "condemnable" and "all too frequent in criminal

trials" attempt to discipline or even name those who engage in conduct that this court has prohibited. Why then should any prosecutor readjust his or her argument to conform to our holdings when nothing happens to those who do not? In light of these facts, I am more than confident that such conduct will be repeated in the future because there are simply no adverse consequences for those prosecutors whose behavior crosses the line, which is what happened in this case. As I explain more fully below, the plain error rule is satisfied here because the complained-of conduct served to deny defendant a fair and impartial sentencing hearing.

At the second stage of the sentence hearing, the State presented evidence in aggravation which consisted of, *inter alia,* defendant's (i) lengthy and violent criminal history, (ii) extensive disciplinary record while incarcerated in the Department of Corrections, and (iii) abusive behavior towards friends and family members. The State did not present any medical or psychiatric experts. The defense case in mitigation consisted of an attempt to establish, as the sole mitigating factor, that defendant suffered from an extreme mental or emotional disturbance when he committed the crimes in the fall of 1991. To that end, the defense presented the testimony of Dr. Daniel Hardy and Dr. Jonathan Pinkus.

Dr. Hardy, a forensic psychiatrist, evaluated defendant and found that he suffered from a schizo-affective disorder that was either aggravated or caused by a history of brain injury documented by previous physicians. Dr. Hardy was aware that other doctors had examined defendant closer in time to the events in question and had diagnosed defendant as a "malingerer." However, Dr. Hardy disagreed with these diagnoses. Dr. Hardy acknowledged that the other doctors had examined defendant closer in time to the events in question and had concluded that defendant did not have a mental ill-

ness. These facts did not cause Dr. Hardy to change his opinion because a significant personality disorder and mental disturbances had been documented in defendant's medical records, which predated the murders in question.

Dr. Pinkus, a professor of neurology, also evaluated defendant. Based upon his own observations and the reports of other professionals, Dr. Pinkus stated that defendant suffered from a brain dysfunction. Dr. Pinkus testified that his diagnosis was confirmed by Dr. Hier, the chairman of the department of neurology at the University of Illinois, who concluded that "cerebral organicity could be a contributing factor in either excessively aggressive behavior or failure to inhibit anti-social or aggressive behavior."

The cross-examination of Dr. Hardy, by Assistant State's Attorney Laura Morask, was vigorous and oftentimes intense. At one point, the following exchange occurred.

"Q. Doctor let me ask it a different way. Did he ever tell you in the 2 hours and 10 minutes that you spent with him that he suffered any childhood abuse?

A. That's the reference that I'm trying to locate, please.

Q. So again you have to search through your records, you don't know this, do you, off the top of your head?

Mr. Mullane [defense counsel]: Objection, Judge.

THE COURT: Overruled.

MS. MORASK:

Q. Would it be correct, Doctor, the longer it takes you to look through the records the more money you're going to make here today?

A. The longer I'm on the witness stand, yes.

Q. Okay. So the answer to that question would be yes?

THE COURT: He answered it.

MS. MORASK: Thank you Judge.

THE COURT: Move on."

The cross-examination continued until the following colloquy:

"Q. [by Ms. Morask] Are you actually saying the defendant's criminal conduct is the result of a physical abnormality, is that what you're saying?

A. Well that he has an abnormal brain that has contributed to it, absolutely.

MR. McKAY [prosecutor]: Objection, Judge, not responsive again.

MR. LEVITT [defense attorney]: You already admonished counsel once about that.

THE COURT: Mr. McKay, Mrs. Morask is the attorney questioning.

MR. McKAY: Can you instruct the witness to answer the question Judge, for once.

THE COURT: Mr. McKay, the attorney questioning him has not required it or asked for it.

MS. MORASK: Judge, I'm asking for this particular question once again.

THE COURT: Ask the question again.

MS. MORASK:

Q. Are you actually telling us that Sanantone Moss' criminality is caused by some boo-boo to the head?

THE COURT: All right, Miss Morask, stop that."

The cross-examination concluded shortly thereafter.

Notwithstanding the circuit court's admonitions during cross-examination, Morask returned to these very themes during closing argument. The record reveals that Morask began her summation by pointing out the suffering defendant had caused, not only to the victims in this case, but to his past victims. She then argued:

"And your job is to weigh that and balance that against what? A boo-boo to the brain. That's what they want you to find precludes imposition of the death penalty.

Ladies and gentlemen, do not forget over the last 2 days we've heard about his life, we heard about his problems, we've heard about his jail cell, we've heard about his medication, we've heard about his brain ad nauseum from psycho-babble that went on and on and on. Do not forget the face of 10 year-old Diandra Jones. Do not forget the face of her mother, Emma Renee Jones and her baby brother, Troy Jones. And her other brother, Matthew

Warner. Do not forget what this case was all about in the beginning.

You may and you must and you shall consider all of the evidence that you have already heard. All of the evidence at the trial, all of the evidence at the eligibility phase.

When you consider all of this evidence and you weigh it against those 2 cash for trash doctors *** you'll see that there are no mitigating factors sufficient to preclude imposition of the death penalty."

At this point, the argument turned toward detailing the evidence that had been adduced regarding defendant's past crimes. Morask then addressed defendant's case in mitigation:

"Then we come to the good doctors. They told you in opening statement that these doctors, that the mitigation, would not be presented as excuses for his behavior. But that's exactly what it is. It's excusing, they're trying to excuse his responsibility for his own criminal conduct. That is what those doctors were trying to do. Doctor Hardy. Doctor, 'I can't answer a question straight if my life depends on it,' Hardy. Doctor 'I can't give a one word answer when 50 words will make me more money.' *** He's a bought and paid for witness.

If you do the math, his 2 hours and 10 minutes with the defendant was charged at four dollars a minute. What he made here in the time he was on the witness stand was far more than you folks make in a day of jury service. This is outrageous.

\* \* \*

Psycho-babble folks, it was all psycho-babble. He discounts, throws away and disregards what was the real evidence, the real findings, from doctors who examined the defendant closest to the time of the crime. And who were they? Doctor Kaplan, Doctor Reifman, Doctor Messina. No evidence of mental illness, no psychosis. What did they find? They found he [defendant] was a malingerer, he's a liar. Doctor Pinkus prefers to call that delusions and Doctor Hardy prefers to call them schizo-affective disorder. If it walks like a duck, it's a duck. They are lies.

They aren't even consistent with their own findings, with each other. Doctor Hardy says there is no childhood

abuse, Doctor Pinkus says, oh, well there is overwhelming childhood abuse but he didn't tell me about it and the fact that he didn't tell me about it is a delusion, not a lie. It's all psycho-babble.

And what do they both rely on? This boo-boo to his brain. This is what they want you folks to rely on to excuse, to justify his criminal conduct, to explain as they say, to take away his responsibility for his criminal conduct.''

Morask concluded her argument by pointing out that defendant had preyed upon children and had chosen a life of violent crime. She asked the jury to sentence defendant to death for all the evil he had done and to protect future children as well as society.

Defendant argues that Morask's comments on the testimony of the two defense experts were improper. According to defendant, the comments did not explain, modify or discredit the substance of their testimony. Rather, their only purpose was to denigrate the witnesses in the eyes of the jury.

Under our plain error analysis, in order to determine whether an alleged error amounts to "plain error," we must first determine whether error even occurred. See *People v. Keene*, 169 Ill. 2d 1, 17 (1995); *People v. Sims*, 192 Ill. 2d 592, 621 (2000). Generally, courts allow prosecutors great latitude in making closing arguments. *People v. Cisewski*, 118 Ill. 2d 163, 175 (1987). The State may, during closing, comment on the evidence presented and draw reasonable inferences from that evidence. *People v. Pasch*, 152 Ill. 2d 133, 184 (1992). Nevertheless, argument that serves no purpose other than to inflame the jury constitutes error. *People v. Tiller*, 94 Ill. 2d 303, 321 (1982). Closing arguments must be viewed in their entirety and the purported improper argument must be taken in context. *Cisewski*, 118 Ill. 2d at 176.

After reviewing the proceedings as a whole, it becomes clear to me, at least, that a good portion of Morask's cross-examination and the argument that followed

it was intended to degrade and insult the defense witnesses in an attempt to weaken the impact their testimony might have had on the jury and to inflame the passions of the jury against defendant's case in mitigation. This court has held that "cross-examination which is designed to harass, annoy or humiliate a witness should not be tolerated." *People v. Lyles*, 106 Ill. 2d 373, 402 (1985), citing *Smith v. Illinois*, 390 U.S. 129, 133, 19 L. Ed. 2d 956, 959-60, 88 S. Ct. 748, 750-51 (1968). Although the trial judge, during the actual cross-examination, admonished Morask to move on, which should have been enough to cure the problem, Morask proceeded to disregard the trial judge's admonition and to inject the term "boo-boo" not once, but twice, into her closing remarks. These comments were exacerbated by Morask's (i) continued references to the doctors' testimony and opinions as "cash for trash," "bought and paid for," and "psycho-babble" and (ii) use of derisive, sarcastic names to refer to the doctors. This type of rhetoric serves no purpose other than to inflame the passions of the jury and denigrate and belittle the defense witnesses in its eyes. Prosecutorial remarks which serve no purpose but to inflame the emotions of the jury are highly improper and have no place in the sentencing phase of a capital trial. *People v. Albanese*, 102 Ill. 2d 54, 81 (1984). This court has repeatedly warned that prosecutors "must exercise the utmost caution in capital cases to avoid the use of such comments." *Lyles*, 106 Ill. 2d at 406.

The complained-of remarks take on added significance when viewed against the fact that the defense called both Dr. Pinkus and Dr. Hardy to testify as expert witnesses regarding *their* opinion of defendant's mental condition, and the State did not call any such expert witnesses to testify to a contrary opinion. Instead, the State relied solely—during cross-examination—on the reports of others in order to contradict and discredit the defense

experts' opinions. I note that in this respect, Morask argued to the jury that Dr. Hardy "discounted," "threw away," and disregarded the "real evidence" and

> "the real findings, from doctors who examined the defendant closest to the time of the crime. And who were they? Doctor Kaplan, Doctor Reifman, Doctor Messina."

I must point out that Doctors Kaplan, Reifman, and Messina did not testify in this case so the reference to their opinions as the "real evidence" is misleading.[1]

Morask's vouching for the credibility of these doctors was also an improper expression of personal opinion: "It is unprofessional conduct for the prosecutor to express his or her personal belief or opinion as to the truth or falsity of any testimony, or evidence \*\*\*." 1 ABA Standards for Criminal Justice 3—5.8(b) (2d ed. 1980). In the commentary to this rule, the ABA notes that prosecutorial conduct in argument "is a matter of special concern because of the possibility that the jury will give special weight to the prosecutor's arguments, not only because of the prestige associated with the prosecutor's office, but also because of the fact-finding facilities presumably available to the office." 1 ABA Standards for Criminal Justice 3—5.8(b), Commentary, at 3.88 (2d ed. 1980). See also ABA Model Rules of Professional Conduct R. 3.4(e) (2001) (prohibiting a lawyer in a trial from "assert[ing] personal knowledge of facts in issue except when testifying as a witness, or stat[ing] a personal opinion as to \*\*\* the credibility of a witness"). The United States Supreme Court has acknowledged similar concerns: "[T]he prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence." *United States v. Young*, 470 U.S. 1,

---

[1] I note that several of these doctors did, in fact, testify at a pretrial hearing on the issue of defendant's fitness for trial. However, none of these doctors testified during the trial proceedings conducted in front of the jury.

18-19, 84 L. Ed. 2d 1, 14, 105 S. Ct. 1038, 1048 (1985). Put another way, the prosecutor "ostensibly speaks with the authority of his office. The prosecutor's 'personal status and his role as a spokesman for the government tend to give what he [says] *** the ring of authenticity *** tend[ing] to impart an implicit stamp of believeability.' " *Commonwealth v. De Christoforo*, 360 Mass. 531, 550, 277 N.E.2d 100, 112 (1971) (Tauro, C.J., dissenting), quoting *Hall v. United States*, 419 F.2d 582, 583-84 (5th Cir. 1969). For these reasons, I believe Morask's remarks were improper.

Having determined that the challenged remarks constituted error, the question turns to whether defendant's procedural default can be excused. See *Keene*, 169 Ill. 2d at 17 (noting that if the error is found not to rise to the level of plain error, the procedural default must be honored). As I noted previously, this court has interpreted Rule 615(a) so as to excuse a procedural default if either the evidence was closely balanced or the error affected substantial rights. We have explained the latter prong of the analysis to mean that "what must be affected by the asserted error must be something 'fundamental to the integrity of the judicial process.' " *Keene*, 169 Ill. 2d at 17, quoting *People v. Green*, 74 Ill. 2d 444, 456 (1979) (Ryan, J., specially concurring). In essence, the fairness of the proceeding must be undermined. *Keene*, 169 Ill. 2d at 17. In a similar vein, I note that the United States Supreme Court has recognized that plain error occurs when the error is said either (i) to have created an "unacceptable danger of prejudicial influence on the jury's verdict," or (ii) to have "seriously affect[ed] the *** integrity or public reputation of [the] judicial proceedings." *United States v. Atkinson*, 297 U.S. 157, 160, 80 L. Ed. 555, 557, 56 S. Ct. 391, 392 (1936).

I believe that the argument conducted by Morask in this case created an "unacceptable danger of prejudicial

influence on the jury's verdict" such as to excuse defendant's procedural default. This court has recognized:

> "It is axiomatic that parties in closing argument may not go beyond the scope of the evidence presented and facts fairly inferable therefrom [citation], misstate the law [citation], or express their personal opinions on the evidence [citation] or on defendant's guilt [citation]. Further, arguments which are calculated to play upon the jurors' emotions are clearly improper. *A penalty of death that may have been imposed under the influence of passion or prejudice cannot stand.*" (Emphasis added.) *People v. Williams*, 161 Ill. 2d 1, 78 (1994).

In my view, it is impossible in this case to say what impact Morask's continued sarcastic characterizations of the defense witnesses and their testimony—as well as her vouching for the credibility of experts who did not testify—may have had on the jury as it deliberated on the question of whether the mitigation precluded the imposition of the death penalty. The record in this case demonstrates that the prosecution chose to respond to the defense's case in mitigation with derision, sarcasm, and rudeness. At times, McKay would "object" that the witness' responses were "nonresponsive" even though his partner, Morask, was conducting the cross-examination. This was done despite repeated admonishments from the trial judge to refrain from the behavior and, unfortunately, added to what was a generally caustic and inflamed atmosphere during cross-examination. Compounding this problem of juvenile behavior on the part of the prosecution team was Morask's tendency to bolster her case by vouching for the credibility of witnesses that she did not call to the stand. This leads me to conclude that the prosecutors' conduct in this matter consisted of "a calculated course of action to play upon and incite the emotions *** of the jury." *Williams*, 161 Ill. 2d at 81. Thus, I cannot say that Morask's argument did not divert the jurors' attention from considering,

dispassionately, the mitigation offered by the defendant in this case, and I am unable to conclude that the misconduct did not serve to increase the likelihood that the jury's decision at the aggravation-mitigation portion of the hearing was based on emotion rather than reason.

In addition, the prosecutorial improprieties of the sort present here appear to indicate a recurring problem in capital proceedings. I must point out that a pattern and practice of intentional prosecutorial misconduct that has not been deterred through other remedies, such as admonishment and condemnation, "may well so seriously undermine the integrity of judicial proceedings as to support reversal under the plain-error doctrine." *Young*, 470 U.S. at 33 n.16, 84 L. Ed. 2d at 24 n.16, 105 S. Ct. at 1055 n.16 (Brennan, J., concurring in part and dissenting in part, joined by Marshall and Blackmun, JJ.). This court has repeatedly held that the conduct at issue here is improper and is to be avoided. *Lyles*, 106 Ill. 2d at 402-03 (denigration of defense witnesses); *Williams*, 161 Ill. 2d at 80 (expressions of personal opinion); *Holman*, 103 Ill. 2d at 172-73 (same). These cases are the established precedent of this court. It must be remembered that this court, by virtue of constitutional mandate, reviews every capital sentence imposed in this state. As such, when we issue an opinion that holds that certain types of arguments are to be avoided and that certain types of arguments are improper, we expect those who practice in our courtrooms to heed our rulings and conform their behavior to our mandates. When members of the bar, who are officers of the court, fail to follow our holdings—designed to ensure the fairness of capital proceedings—the result serves to compromise the very integrity and public reputation of this court's administration of justice.

As I alluded to earlier, this court has attempted to police this type of argument before by admonishing

against its future commission. In *People v. Kidd*, 175 Ill. 2d 1 (1996), the court was confronted with very similar conduct occurring, as in this case, in a capital trial in Cook County. The prosecutor in *Kidd* engaged in the same type of juvenile name-calling and sarcasm that is present in the case at bar. We upheld the sentence, noting that the trial judge had taken steps to lessen the prejudicial effect of the improper remarks and conduct, a fact that is absent in this case. Nevertheless, we specifically warned that prosecutors "violate the trust reposed in them by the public *when they risk reversal of an otherwise proper conviction or death sentence* for unprofessional conduct of this nature." (Emphasis added.) *Kidd*, 175 Ill. 2d at 54. More pointedly, two justices specially concurred in order to strongly condemn the conduct and to advise against its future occurrence:

> "Unless the trial and reviewing courts rebuke such egregious misconduct, there is little incentive in future cases for others to refrain from improper jibes, sarcasm, and outright distortions of the law. No matter how deplorable the crime in issue or how inadequate the defense theories may be perceived by the prosecution, the larger policies of fair trial and proper courtroom decorum inveigh against the type of prosecutorial remarks and conduct that occurred here. Such behavior benefits no one, not the people of Illinois who are represented by the prosecutor, not the victim's families, and certainly not the individuals whose sole transgression was to give testimony on behalf of the defense.
>
> In my opinion, the conduct described herein borders on constituting reversible error. For these reasons, I write separately to emphasize my *strong disapproval of the prosecutorial remarks in the instant case and to caution lawyers and judges to vigorously guard against such unprofessional conduct*." (Emphasis added.) *Kidd*, 175 Ill. 2d at 58-59 (McMorrow, J., specially concurring, joined by Freeman, J.).

*Kidd* was issued on December 19, 1996. The oral argument conducted in the present case was held on October

30, 1998, nearly two years later. Nevertheless, the juvenile name-calling here is very similar to that condemned in *Kidd* as improper and unprofessional. It is obvious to me that our admonishments—that such behavior risks reversal—have not been heeded. Indeed, the sarcasm in this case was worsened by the fact that the prosecutor improperly bolstered her case by vouching for the credibility of witnesses who did not testify. Thus, the conduct that we urged prosecutors to refrain from in *Kidd* was not only repeated here, but was compounded by even more improper conduct. For this reason, the result that obtained in *Kidd*, an affirmance, cannot be obtained in this case.

Unfortunately, the kind of courtroom tactic which occurred in this case does not appear to be an isolated occurrence. This court recently cited the conduct of two assistant State's Attorneys as lacking in maturity and professionalism, once again in a Cook County courtroom during a capital trial. See *People v. Blue*, 189 Ill. 2d 99, 142 (2000). The frequency with which this court is seeing such behavior is not only alarming, but causes legitimate public concerns regarding the fairness and integrity of these proceedings. At a capital sentencing hearing, the trier of fact is given the duty of determining whether the ultimate punishment is to be inflicted upon the defendant. As such, the proceeding is a solemn one. Courtroom decorum and dignity must be vigorously guarded. In this regard, I believe that the United States Supreme Court's observation in *Young* is particularly relevant in this case.

> "The kind of advocacy shown by this record has no place in the administration of justice and should neither be permitted nor rewarded; a trial judge should deal promptly with any breach by either counsel. ***
>
>          \* \* \*
>
> We emphasize that the trial judge has the responsibility

> to maintain decorum in keeping with the nature of the proceeding; 'the judge is not a mere moderator, but is the governor of the trial for the purpose of assuring its proper conduct.' [Citation.]" *Young*, 470 U.S. at 9-10, 84 L. Ed. 2d at 8-9, 105 S. Ct. at 1043-44.

I agree with this sentiment and urge our trial judges to deal promptly with actions that serve to debase our criminal proceedings and jeopardize their fairness.

Although I find the remarks of Morask to constitute reversible error, in and of themselves, I also wish to address the other comments that defendant identifies on appeal as being plain error. In this regard, I note that the court states that Morask's use of sarcasm was "completely unacceptable" but does not speak to the comments made during rebuttal by Assistant State's Attorney James McKay. I believe the court errs greatly by not mentioning these other remarks because they are equally as egregious and improper as those made by Morask.

In rebuttal closing argument, McKay told the jury, among other things, that "[g]iving [defendant] natural life is an American Express Gold Card for this defendant to assault correctional officers, prison staff, cafeteria workers, possessing shanks, sharpened to a point to stab anybody who makes him angry." McKay further argued that "[t]he bed on death row was reserved for him. Natural life is the minimum. Natural life is the minimum sentence. You know, just killing Diandra, just killing a girl under the age of 12, just killing one witness to prevent her from testifying gets the minimum. Are we suggesting that Emma's murder was a freebie? He's asking you for the minimum. What in the world has he done in his life to deserve the minimum."

This court has, in the past, allowed arguments regarding a defendant's future dangerousness when those arguments are based on the evidence. See *People v. Kidd*, 175 Ill. 2d 1, 51 (1996); *People v. Bounds*, 171 Ill.

2d 1, 66 (1995), *People v. Johnson*, 146 Ill. 2d 109, 148-49 (1991). Indeed, the United States Supreme Court has held that a jury may determine a defendant's future dangerousness in weighing whether to impose a sentence of death. See *Jurek v. Texas*, 428 U.S. 262, 49 L. Ed. 2d 929, 96 S. Ct. 2950 (1976). McKay's argument, however, did more than ask the jury to consider the defendant's potential, as shown by the evidence, for future violence. McKay told the jury that it would be providing the means for defendant to commit such acts if it chose to impose a sentence of natural life. In today's culture, an American Express Gold card has certain connotations that are unmistakable, among which are the freedom and the privileges bestowed upon the holders of a such a card. In this case, McKay subtly told the jurors that they would be giving defendant the freedom to commit future violent acts and that, as a result, they would bear the responsibility for those acts if the jury were to choose to impose a sentence of natural life. Rather than emphasize the jury's responsibility in deciding whether defendant should live or die, McKay emphasized the jury's responsibility for future criminal acts that might be committed at defendant's hands if he were not sentenced to death. This type of argument serves no function other than to increase the likelihood of a verdict reached by emotion rather than reason, which is unacceptable.

Moreover, I note that McKay's use of the term "freebie" to characterize the murder of Emma Jones was also improper. See *People v. Kuntu*, 196 Ill. 2d 105, 144-47 (2001). McKay's argument was not an accurate statement of the law as we explained in *Kuntu*. The use of the term "freebie," in this context, improperly conveys to the jury the notion that, if it did not return a sentence of death, defendant would be "getting away" with something. See *Kuntu*, 196 Ill. 2d at 145-46 (holding that such an argument is an improper statement of law which war-

rants reversal of death sentence). Although I acknowledge that defendant did not identify this remark as error, the precedent of this court nevertheless dictates that we reverse on this basis. The court today does not honor this precedent and, in so doing, calls into question whether *Kuntu*, an opinion decided just four months ago, is still good law. My concern in this area is more than just rhetorical—we have taken under advisement People v. Morris, No. 87645, which raises questions concerning yet another closing argument in which a prosecutor speaks in terms of "freebies." The law of this court, particularly in capital cases, cannot be seen by the bar and the public to be one that is constantly "in flux," changing from opinion to opinion with respect to the same issue.

In voicing my dissent, I am mindful that closing arguments "are seldom carefully constructed *in toto* before the event; improvisation frequently results in syntax left imperfect and meaning less than crystal clear" and that a court "should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." *Donnelly v. DeChristoforo*, 416 U.S. 637, 646-47, 40 L. Ed. 2d 431, 439, 94 S. Ct. 1868, 1873 (1974). This cannot be said of the complained-of comments in the present case.

The United States Supreme Court has noted the importance of a prosecuting attorney as "the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in peculiar and very definite sense the servant of the law, the two-fold aim of which is that guilt shall

not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods *** as it is to use every legitimate means ***." *Berger v. United States*, 295 U.S. 78, 88, 79 L. Ed. 1314, 1321, 55 S. Ct. 629, 633 (1935). This court has echoed the same concerns by reminding that an assistant State's Attorney "is the representative of all the people, including the defendant, and it is as much his duty to safeguard the constitutional rights of the defendant as those of any other citizen." *People v. Oden*, 20 Ill. 2d 470, 483 (1960). Moreover, we have stated that a prosecutor "has an obligation to comport himself in a manner which not only ensures that the defendant receives a fair sentencing hearing but which inspires respect for the administration of justice." *Lyles*, 106 Ill. 2d at 412. It is very difficult to see how either of these objectives were achieved in this case.

Notwithstanding the court's words of condemnation (205 Ill. 2d at 171) nor the concurring justice's reiteration of her strong disapproval of this type of courtroom behavior (see 205 Ill. 2d at 174 (McMorrow, J., specially concurring), my colleagues' disposition of this issue will serve only to embolden those who would engage in such highly charged rhetoric and confuse the trial judges who have to deal with it. This court cannot expect the trial judges to vigorously guard against improper conduct if we ourselves fail to address the problem with any consistency. I note that this court, in 1999, established a Special Supreme Court Committee on Capital Cases in order "to study the trial and sentencing processes in capital cases in Illinois." M.R. 15833 (April 6, 1999). Both the executive and legislative branches of our state government likewise established similar committees designed to review the state's administration of capital

punishment. Each of these committees focused on, *inter alia,* the role of improper prosecutorial conduct in death penalty cases and ways to improve upon the trial processes which lead to capital convictions and sentences. In some cases, recommendations were made from these committees. The committees serve noble goals; however, they do not and cannot replace the responsibility of this court to take action against improper conduct when confronted with such conduct on appeal. The notions of reform ring hollow when this court, faced with conduct which requires reversal, fails to acknowledge it.

In light of the above, I would vacate defendant's death sentence and remand the matter for a new second phase of the death sentencing hearing. See *People v. Thompkins,* 191 Ill. 2d 438, 477 (2000).

JUSTICE KILBRIDE joins in this partial concurrence and partial dissent.

CHIEF JUSTICE HARRISON, dissenting:

While this matter was pending on direct review, our court adopted a comprehensive set of new rules governing the conduct of cases in which the State is seeking the death penalty. With certain exceptions, the new rules took effect March 1, 2001. Official Reports Advance Sheet No. 6 (March 21, 2001). For the reasons set forth in my dissenting opinion in *People v. Hickey,* 204 Ill. 2d 585, 631-36 (2001) (Harrison, C.J., dissenting), the procedures contained in the new rules are indispensable for achieving an accurate determination of innocence or guilt and are applicable to all capital cases now coming before us on direct review. Because this defendant was tried, convicted and sentenced without the benefit of the new rules, his conviction and sentence should be vacated, and the cause should be remanded to the circuit court for a new trial in conformity with our new rules.

Even if defendant were not entitled to a new trial, I

still could not join in the majority's opinion. For the reasons set forth in my partial concurrence and partial dissent in *People v. Bull*, 185 Ill. 2d 179 (1998), the Illinois death penalty law violates the eighth and fourteenth amendments to the United States Constitution (U.S. Const., amends. VIII, XIV) and article I, section 2, of the Illinois Constitution (Ill. Const. 1970, art. I, § 2). At a minimum, defendant's sentence of death should therefore be vacated, and the cause should be remanded to the circuit court for imposition of a sentence of imprisonment. Ill. Rev. Stat. 1989, ch. 38, par. 9—1(j).

JUSTICE KILBRIDE, also dissenting:

I respectfully join with Justice Freeman in his partial dissent concerning the prosecution's closing arguments. Additionally, for the reasons set forth in my dissents in *People v. Hickey*, 204 Ill. 2d 585, 636-40 (2001) (Kilbride, J., dissenting), and *People v. Simpson*, 204 Ill. 2d 536, 581-85 (2001) (Kilbride, J., dissenting), I agree with Chief Justice Harrison that defendant's convictions and sentence should be set aside because the trial proceedings were not conducted in accordance with the new supreme court rules governing capital cases. As I stated in my dissents, the procedures in capital cases prior to this court's adoption of the new rules were inherently unreliable and did not sufficiently protect a defendant's constitutional rights. Consequently, since the new rules were promulgated to address the deficiencies of constitutional dimension that regularly occurred under the old system, the rules must be applied retroactively to all capital cases currently pending on direct appeal. See *People v. Hudson*, 195 Ill. 2d 117, 126 (2001), citing *Griffith v. Kentucky*, 479 U.S. 314, 328, 93 L. Ed. 2d 649, 661, 107 S. Ct. 708, 716 (1987). For those reasons, I respectfully dissent.