THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MICHAEL TAYLOR, Defendant-Appellant.

First District (5th Division) No. 1—01—2101

Opinion filed September 24, 2004.—Rehearing denied November 30, 2004.

Michael J. Pelletier and Vicki Kouros, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb and Jon J. Walters, Assistant State's Attorneys), for the People.

JUSTICE NEVILLE delivered the opinion of the court:

Michael Taylor and Terrence Willis were charged in connection with an incident that occurred on December 23, 1998. Prior to the trial, the Willis and Taylor cases were severed and Taylor was tried by a jury. After the jury trial, defendant, Michael Taylor, was convicted of aggravated battery, aggravated unlawful restraint, and attempted escape. The court sentenced Taylor to five years' imprisonment for aggravated battery, five years for attempted escape, and three years for aggravated unlawful restraint, all sentences to be served concurrently.

Taylor now appeals, presenting the following issues for our review: (1) whether the State proved Taylor guilty beyond a reasonable doubt, under an accountability theory, of aggravated battery, aggravated unlawful restraint and attempted escape; (2) whether the plain language of section 31—6(a) of the Criminal Code of 1961 (the Code) (720 ILCS 5/31—6(a) (1998)) precludes the prosecution of juveniles thereunder; and (3) whether the trial court improperly allowed the jury to consider Taylor's prior juvenile adjudication to impeach his testimony.

## BACKGROUND

## THE STATE'S CASE

## RALPH SMITH'S DIRECT TESTIMONY

Ralph Smith, a detention counselor at the juvenile temporary detention center, testified that, at approximately midnight on December 23, 1998, he arrived for his 12 to 8 a.m. shift in section 4G of the detention center. There are 18 cells in unit 4G and each cell houses one resident. The cells have glass doors and contain a bed, a desk, a toilet, a face bowl, bed linen, and personal items belonging to the residents. Smith testified that when he arrived for his shift, all the residents were in their cells.

Smith testified that a few minutes after he arrived on duty, Terrence Willis, a resident assigned to cell 3, called to Smith, who was sitting at a console about 30 to 40 feet away from cell 3, and asked Smith to bring him some tissues. Smith approached the door to Willis's cell, intending to slide the tissue under the door. When Smith arrived at the cell, Willis pushed the door open, grabbed him around the neck from behind, and cut his throat with a box cutter. Smith testified specifically that at the time Willis cut him, Willis was standing behind him. Smith also testified that, at this time, no other residents were out of their cells.

Smith testified that Willis ran to the console and pulled all the phone cords out. Willis asked Smith for his keys and Smith said no. After having a few words, Willis cut Smith's hands and Smith dropped the keys. Willis picked up the keys and at that time Smith was "still in shock." Willis next "opened some doors." When asked specifically whose door Willis opened, Smith stated, "I know he [Willis] opened Michael Taylor's door." After Willis opened Taylor's door, Willis asked Taylor to help him. Smith told Taylor, "[D]o not get involved. Go back in your room." Taylor walked back and forth about the unit, but Smith did not know specifically what Taylor did at that point.

Smith testified that after Willis freed Taylor from his cell, Willis told Smith to go into cell 12, which was assigned to Tommy Wilson. The door to Wilson's cell was open, and there was no one inside. Smith refused to enter Wilson's cell and threw a chair. Willis, with the assistance of Taylor, then attempted to push Smith into Wilson's cell. Smith struggled to keep the door open but he was overpowered by Willis and Taylor. The door was closed and locked. While locked in Wilson's cell, Smith stated he lost a lot of blood.

Smith testified that after being locked in Wilson's cell, he banged the bed frame on the floor to alert other staff members he needed help. When asked specifically what he saw Taylor do after he, Smith, was locked in Wilson's cell, Smith responded: "Well, I was really in a state of shock. I know there was a lot of movement. I don't know exactly what was going on."

Smith testified he next saw Melvin McBride, supervisor at the detention center, come to the door to section 4G. Willis ran up to the door, and McBride closed the door to keep Willis locked inside the unit. McBride returned shortly with others to help Smith, including supervisor Albert Liggauyu, Zack Moore, and Cornelius Holloway. Smith stated he was feeling "[r]eal weak." Smith stated, "I was on my way out." And further that "[he] was real fainty and, you know, probably going into shock or on the verge of going into shock." Paramedics arrived and took Smith to the hospital, where he had surgery on his neck and hand. Smith remained in the hospital for two to three days.

## RALPH SMITH'S TESTIMONY ON CROSS-EXAMINATION

### Smith's Pretrial Report to His Superiors

Smith testified on cross-examination that he prepared a written report of the incident, dated January 3, 1999, and faxed it to Michael Granberry, the floor manager. Defense counsel asked Smith to review

defense exhibit 1 and Smith identified it as the report he faxed to Granberry.[1]

Smith was questioned as to the statements he made in the report. Smith agreed that he reported that he could not remember if Taylor assisted in helping lock the door. Smith agreed that the only mention of Taylor in the letter to Granberry is that Smith could not remember if Taylor assisted. Smith also agreed that the letter does not say who pushed him into the door. Finally, Smith agreed that the letter does not say who locked the door.

## Smith's Other Testimony

Smith also testified on cross-examination that "after [he] was cut [he] was in shock." Smith agreed that after Willis took the keys he lost a lot of blood and was going into shock. Smith testified that he saw Willis open Taylor's door with the keys and that it was not until he was pushed into Wilson's cell that he heard other doors opening. Smith agreed that Willis opened Taylor's door and asked Taylor to assist him and that he (Smith) told Taylor not to get involved. Smith also agreed that he saw Taylor "walking back and forth" and that there was confusion.

## TOMMY WILSON'S TESTIMONY

### Wilson's Pretrial Statement to Police

Tommy Wilson testified that, in December 1998, he was a resident of the detention center and assigned to cell 12 in section 4G. Wilson was questioned about inconsistencies between the story he originally told police immediately after the incident and the story testified to at trial. In his first version of events, Wilson told Officer Michael Hughes (1) that Willis and Taylor were out of their cells when Smith began his shift, (2) that a fight broke out between Willis and Smith when Smith tried to get Willis and Taylor into their cells, and (3) that Taylor joined in the fight between Willis and Smith. Wilson also originally told police that Taylor took Smith's keys and opened Wilson's door and Willis threatened his (Wilson's) life by holding a knife to his face.

### Wilson's Direct Testimony

Wilson testified to a different version of events at trial. Wilson testified that shortly after midnight on December 23, 1998, he was standing by the glass door of his cell when he observed the following: Smith was escorting Willis back to his cell; Smith and Willis begin to

---

[1]Although both parties reference the report in their briefs before this court, a copy is not a part of the record on appeal. Taylor's attorney stated at oral argument that the report was not admitted into evidence.

struggle in an aggressive way; and Willis tried to push his cell door open as Smith was attempting to push it shut. Willis cut Smith's throat with a box cutter. Smith threw his hands up and Willis cut Smith's hands several times.

Wilson testified that he watched Smith move toward the console and attempt to grab the phone but saw Willis grab the phone and throw it across the unit. Willis and Smith began to struggle again. Willis opened his (Wilson's) cell, cell 12, and attempted to push Smith inside. Wilson ran out of his cell and toward the TV room. Willis was not able to get Smith into cell 12 by himself so Willis opened Taylor's door, cell 14, and asked Taylor to help him put Smith into Wilson's cell. Taylor, after being let out of his cell, went up behind Smith and pushed Smith as Willis pulled Smith into Wilson's cell. After putting Smith in Wilson's cell, Taylor ran toward the bathroom area. Wilson then heard Willis call Taylor back to help lock the door. Wilson specifically stated, "I saw [Taylor], you know, put his hands on the door and one of his feet, you know, and help push, you know, the door closed so they could lock it."

Wilson testified that after Smith was locked in the cell, Willis and Taylor took a chair and repeatedly smashed it against the window in Taylor's cell. Willis next used the keys to unlock a wall cabinet and retrieve a baseball bat. Willis returned to Taylor's cell and banged on the window with the baseball bat. During this time, Smith was lying on the floor in Wilson's cell. Wilson did not hear any noise coming from the cell.

Wilson testified that he next saw a staff member come to the section. The staff member took his keys out of his pocket and opened up the door to the unit. At this time, Willis and Taylor were both in the bathroom area. Willis came from the bathroom area and approached the staff member at the door. Willis told the staff member that Smith was bleeding in the bathroom and needed help. Willis struggled with the staff member and attempted to pull him into the section, but the staff member was able to close the door. Wilson next saw Taylor and Willis run off in different directions.

### Wilson's Testimony on Cross-Examination

On cross-examination, Wilson testified that Willis and Smith were face-to-face when Willis cut Smith's throat. He specifically testified that he did not see Willis come from behind and cut Smith's neck from behind. Also, in direct contradiction with his testimony on direct examination, Wilson testified on cross that Willis let Taylor out of his cell before letting him out of his cell. And, when he was let out of his cell, he (Taylor) went "[t]owards the corner of the console." According

to Wilson, Taylor remained "in the corner of the console until they [Willis and Taylor] got through doing everything they were doing *** about 10, 15 minutes."

## VINCENT TORRENTT'S TESTIMONY

Vincent Torrentt testified that, in December 1998, he was a resident of the detention center and assigned to cell 4 in section 4G. Shortly after midnight, while watching television through his cell door, he heard Willis, the resident in the cell next to his, ask Smith for some toilet paper. Smith walked over to Willis's door and Torrentt heard a door unlock. Willis exited his cell, walked past Torrentt's cell and said, "[W]hat's up, white folks?" Torrentt responded that he was "straight" and Willis walked back toward his cell. Torrentt next saw Willis cut Smith's throat with a box cutter. Willis and Smith were face-to-face when Willis cut Smith's throat.

Torrentt testified that after Willis cut Smith's neck, Willis demanded Smith's keys. Smith responded that Willis would have to kill him to get the keys. Willis cut Smith's throat a second time, and Smith dropped his keys. Willis picked up the keys and went to the console area. Smith walked toward the console, but before he reached it, Willis yanked the cords from the phones. Smith threw a chair at Willis. Willis then cut Smith's forearm.

Torrentt testified that Willis next went to Wilson's cell and told Tommy Wilson to "get the f--- out of the cell." Wilson ran out of the cell and hid under the console. Willis then tried to pull Smith into Wilson's cell, but was unable to do so. Willis ran toward Taylor's cell and Torrentt heard a door unlock. Taylor and Willis walked toward Smith. Taylor pushed Smith from behind and told him, "Just go in the cell so Terrence don't hurt you." Taylor pushed and Willis pulled Smith into the cell. Torrentt heard the door slam and lock and then heard banging coming from Wilson's cell.

Torrentt testified that after Smith was put in Wilson's cell, Taylor and Willis grabbed some chairs and moved toward the main bathroom. Torrentt then saw Melvin McBride come to the door. McBride opened the door in the unit and Willis approached McBride from the direction of the bathroom. Torrentt did not know where Taylor was at that time. Willis told the staff member, "I'm trying to help Mr. Smith out because one of the residents is trying to kill him." Willis struggled with McBride but McBride was able to close the door. Willis and Taylor then left the section, running in opposite directions.

## MELVIN MCBRIDE'S TESTIMONY

Melvin McBride, another detention counselor at the detention center, testified that, on December 23, 1998, he was working from 10 p.m.

to 6 a.m. in section 4H, which is located next to section 4G. McBride received a call from a coworker and went to unit 4G. When McBride arrived at the outer door to section 4G, he noticed blood splattered on the window and around the console. McBride saw chairs knocked over and the phone pulled out of the unit. McBride also saw the residents yelling from their individual cells. He did not see any residents out of their cells.

McBride testified that he opened the door and called for Smith. After yelling for Smith about seven times, he heard Willis respond from the back. Willis appeared from the main washroom area, which is located in the back of the unit, and approached him. Willis was "drenched in blood" and told McBride that Smith needed some assistance in the back. McBride stated that as he was standing in the open doorway, Willis grabbed his arm and attempted to pull him into the unit. McBride struggled to stay on the outside. During the struggle, Willis called out, "Man, I need some help. Give me some help." Another resident, whom McBride described as "basically dark skin, little Afro, tall," came from the washroom toward him. McBride did not see the face of the person who appeared from the bathroom in response to Willis's call for help but stated that he looked like Taylor.

McBride testified that he was able to remove Willis's hand from his arm and close the door. McBride ran to the next unit to get assistance. While getting help, McBride heard the door to unit 4G slam. McBride stated he was about "20 paces" away from unit 4G at the time. McBride ran towards unit 4G and saw Willis heading toward the elevator.

## ALBERTO LIGGAUYU'S TESTIMONY

Alberto Liggauyu, a supervisor of the juvenile counselors at the detention center, testified that, on December 23, 1998, he was working as a supervisor of the fourth floor. Shortly after midnight, Liggauyu received a call from Timothy Thomas, the counselor in charge of section 4F. After speaking with Thomas, Liggauyu tried to call section 4G but did not get a response. Liggauyu then went to section 4G.

Liggauyu testified that when he arrived at section 4G, he unlocked the outer doors and saw Wilson out of his cell, standing under a clock between cells 10 and 11. Liggauyu also noticed a lot of blood around the section and heard a lot of noise from the residents. Liggauyu performed a check of the cells and found Smith locked in Wilson's cell. He opened the door, carried Smith to a chair and tried to help stop the bleeding from the wound in Smith's neck. Liggauyu called in a medical emergency for Smith's injuries.

Liggauyu testified that after medical help arrived for Smith, he

surveyed the residents' cells. In cell 3, Willis's cell, he found about three bedsheets tied together end to end. In cell 14, Taylor's cell, Liggauyu found bedsheets tied together and a broken baseball bat. Liggauyu also stated that the window in cell 14 was shattered.

On cross-examination, Liggauyu testified that Tommy Wilson was out of his cell and was the first person he spoke with when he arrived at unit 4G. Liggauyu did not see Taylor.

## MICHAEL GRANBERRY'S TESTIMONY

Michael Granberry, administrative assistant at the detention center, testified that on December 23, 1998, he left work at 11 p.m. and was on his way home when he received a 911 call from the detention center. By the time Granberry arrived back at the detention center, Smith had already been transported to the hospital and all the residents were locked in their cells with the exception of the men housed in cells 3, 12, and 14. Granberry observed a lot of blood in cell 12 (Wilson's cell) and a cracked window in cell 14. He also saw an orange box cutter on the floor.

According to Granberry, he spoke with Vincent Torrentt about the disturbance that evening. Granberry testified he later received a letter from Torrentt detailing the events of the night. About 10 days after the incident, Granberry also received a letter from Smith describing the events of the night.

## THE EXPERT WITNESSES' TESTIMONY

Dr. Constantine Tatooles, an expert in the field of a cardiovascular and thoracic surgery, and the doctor who performed surgery on Smith, testified that Smith arrived at the hospital covered in blood with a gaping wound at the base of his neck. During surgery, Dr. Tatooles discovered that Smith's jugular vein had been cut and that Smith had lost a significant amount of blood from his injury. Dr. Tatooles noted Smith suffered from secondary wounds on his hands, but he did not operate on those injuries. According to Dr. Tatooles, Smith would have died from his injuries if not treated.

Amy Collins, from the Illinois State Police forensic science command, testified as an expert in the field of forensic science and latent prints. Collins stated she examined the baseball bat and an orange utility knife, but was unable to find fingerprints on either.

Officer Maureen Henderson, an evidence technician with the Chicago police department, testified that on December 23, 1998, she photographed section 4G and cells 3, 12 and 14 and processed those cells for evidence. In cell 3 (Willis's cell), Officer Henderson found bedsheets on the floor that had been tied together. In cell 12 (Wilson's cell), Officer Henderson observed large amounts of blood and furniture

in disarray. In cell 14 (Taylor's cell), Officer Henderson found the window shattered, a baseball bat that had been splintered into three pieces, and bedsheets that had been tied together. Officer Henderson also processed the main bathroom and found the water in the toilet to have a red stain and a red stain on a sink. She also photographed Taylor and Willis.

Last, the State offered a stipulation from an expert in serology that human blood was found on the box cutter, and the State also submitted a certified copy of Taylor's adjudication of delinquency for robbery. The State then rested its case in chief. Taylor moved for a directed verdict and the trial court denied the motion.

## MICHAEL TAYLOR'S CASE

Taylor testified that on December 23, 1998, he was asleep in cell 14, in section 4G at the detention center. According to Taylor, Tommy Wilson entered his cell with a chair and told him "to get the f--- out of the cell." Taylor exited his cell and was putting his shoes on when he saw Willis "tussling and arguing" with Smith, who was bleeding. Taylor testified that Willis told him to come help him. Smith told him not to help and to go back into his cell. Taylor stated that he did not help, but instead ran into the bathroom, entered the last stall, got on his knees, and covered his face and his ears. Taylor said he did this because he was feeling scared of all the commotion going on in the section.

Taylor testified that he came out of the bathroom when all the noise had "gone down." When he exited the bathroom, he saw Smith locked in a cell, banging on the glass door with a chair, and screaming for help. Taylor ran out of the section to get help and found an attendant, Zack Moore.

Taylor testified that he did not plan to escape with Willis that night nor had he planned to attack Smith with Willis or restrain him in a cell. He did not know about the sheets in his cell. He went into the bathroom because he was scared of Willis and Wilson.

## THE STATE'S REBUTTAL

In rebuttal, the State offered the testimony of Officer Michael Hughes of the Chicago police department. Officer Hughes testified that he interviewed Taylor in the presence of his partner and a youth officer. During the interview, Taylor did not tell him that Wilson came into his cell with a chair and ordered him out of his cell, but instead Taylor merely said that Wilson opened his cell door. Taylor did not tell Officer Hughes that he hid in the bathroom. He told Officer Hughes that he saw the blood and ran out to find help.

## THE VERDICT AND SENTENCE

At the conclusion of the trial, the jury found Taylor guilty of aggravated battery, aggravated unlawful restraint and attempted escape. The trial court sentenced Taylor, as an adult, to five years' imprisonment for attempted escape and aggravated battery and three years for aggravated unlawful restraint, to be served concurrently.

## ANALYSIS

Taylor argues in his brief that the State failed to prove his guilt beyond a reasonable doubt on two theories: (1) that the State failed to prove him guilty beyond a reasonable doubt of the substantive offenses of aggravated battery, aggravated unlawful restraint, and attempted escape; and (2) that the State failed to prove him guilty beyond a reasonable doubt of aggravated battery, aggravated unlawful restraint, and attempted escape on an accountability theory. With respect to Taylor's first theory, the State concedes that Taylor did not commit the substantive offenses of aggravated battery or aggravated unlawful restraint. At oral argument, the State argued instead that Taylor "should be accountable for all the crimes that occurred despite the fact that he only aided and abetted in one of them." Therefore, the question we must address is whether Taylor is accountable for the offenses of aggravated battery and aggravated unlawful restraint, which were committed by Willis, based on Taylor's alleged participation with Willis in an escape attempt.

■ ■ Accountability is not a crime in and of itself but, rather, a mechanism through which a criminal conviction may result. *People v. Hicks*, 181 Ill. 2d 541, 547 (1998). Section 5—2(c) of the Code provides that a person may be held accountable if, "[e]ither before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." 720 ILCS 5/5—2(c) (West 1998). Here, the State argues that Taylor is accountable because he aided and abetted Willis in the planning or commission of the offense of escape. The escape statute provides that "[a] person convicted of a felony or charged with the commission of a felony who intentionally escapes from any penal institution or from the custody of an employee of that institution commits a Class 2 felony." 720 ILCS 5/31—6(a) (West 1998).

Prior to reviewing the sufficiency of the evidence, the court must first determine, as a matter of law, whether Taylor, a juvenile, can be found guilty of escape when he has never been "convicted of a felony" or "charged with the commission of a felony" because each is an element of the offense and one must be proved to establish a violation of

the escape statute. In order to determine if Taylor's status as a juvenile brings him within the purview of the escape statute, we must examine the language in the escape statute. See 720 ILCS 5/31—6 (West 1998). In light of the fact that this case presents a question of law, we review this issue *de novo*. *Lucas v. Lakin*, 175 Ill. 2d 166, 171 (1997).

It is well established that the primary rule of statutory construction is to ascertain and effectuate the intent of the legislature. *People v. Hickman*, 163 Ill. 2d 250, 261 (1994). The court's review must always begin with the language of the statute because it is the surest and most reliable indicator of legislative intent. *People v. Pullen*, 192 Ill. 2d 36, 42 (2000). The statutory language must be given its plain and ordinary meaning, and where the language is clear and unambiguous, it must be applied without resort to other aids of construction. *People v. Moss*, 205 Ill. 2d 139, 164 (2001). The court may not, under the guise of statutory interpretation, "correct" an apparent legislative oversight by rewriting a statute in a manner inconsistent with its clear and unambiguous language. *Pullen*, 192 Ill. 2d at 42.

The escape statute applies to "[a] person convicted of a felony or charged with the commission of a felony." 720 ILCS 5/31—6(a) (West 1998). At the time of the alleged escape, Taylor had not been convicted of nor charged with the commission of a felony. "[P]roof of a prior felony conviction is an essential element" and a condition precedent that must be established in proving the offense of felony escape or attempted felony escape. *People v. McCollum*, 72 Ill. App. 3d 174, 176 (1979). The question is whether a juvenile with a juvenile delinquency adjudication is "a person convicted of a felony" as provided in the escape statute. The Unified Code of Corrections defines "conviction" as "a judgment of conviction or sentence entered upon a plea of guilty or upon a verdict or finding of guilty of an offense, rendered by a legally constituted jury or by a court of competent jurisdiction authorized to try the case without a jury." 730 ILCS 5/5—1—5 (West 1998). Juvenile delinquency adjudications are noticeably not included in the Code's definition of "conviction." 730 ILCS 5/5—1—5 (West 1998).

In determining if a juvenile adjudication constitutes a "conviction," we will look at other juvenile cases that construe the word "conviction" when applying it to juveniles. In *In re W.W.*, 97 Ill. 2d 53 (1983), the State filed a motion in the appellate court for State's Attorney fees in the amount of $50 after defending an appeal brought by a juvenile. The appellate court granted the State's motion and the minor appealed. *In re W.W.*, 97 Ill. 2d at 54-55. The State maintained that it was entitled to the $50 fee because the legislature did not exempt juvenile delinquents from payment of statutory State's At-

torney fees. *In re W.W.*, 97 Ill. 2d at 56-57. In deciding the issue, the supreme court stated that if a statute has remedial features but is in derogation of the common law, it will be strictly construed when determining what persons come within its operation. *In re W.W.*, 97 Ill. 2d at 57. The supreme court also stated that such statutes will not be extended any further than the language of the statute absolutely requires by its express terms or by implication. *In re W.W.*, 97 Ill. 2d at 57. The *In re W.W.* court noted that juvenile proceedings are not criminal in nature and held that a minor is not "convicted." *In re W.W.*, 97 Ill. 2d at 57.

In *People v. Rankin*, 297 Ill. App. 3d 818 (1998), defendant was convicted of unlawful possession of a weapon by a felon and sentenced to an extended-term sentence based on the defendant's 1993 felony conviction, but the court stated it could have imposed the extended term based on his juvenile adjudication for residential burglary. *Rankin*, 297 Ill. App. 3d at 821. The trial court imposed an extended-term sentence pursuant to "[s]ection 5—5—3.2 of the [Unified] Code [of Corrections, which] authorizes extended-term sentencing when a defendant is convicted of any felony, 'after having been previously *convicted* in Illinois *** of the same or similar class felony or greater class felony.' (Emphasis added.) [Citation.]" *Rankin*, 297 Ill. App. 3d at 824. Defendant appealed and argued the court had no authority to impose an extended-term sentence based on his juvenile adjudication. *Rankin*, 297 Ill. App. 3d at 824. The Fourth District reversed on appeal. The court reviewed the Unified Code of Correction's definition of "conviction" (730 ILCS 5/5—1—5 (West 1994)) and noted it does not include juvenile adjudications. *Rankin*, 297 Ill. App. 3d at 824. The *Rankin* court emphasized that the legislature could have included juvenile delinquency adjudications in its definition of "conviction" or made specific reference to such adjudications in discussing when extended-term sentences may be imposed but it did not do so. *Rankin*, 297 Ill. App. 3d at 825. Therefore, the *Rankin* court concluded, the defendant's juvenile delinquency adjudication could not serve as a basis to impose an extended-term sentence because it is not a conviction. *Rankin*, 297 Ill. App. 3d at 825.

The State asserts that *In re W.W.* and *Rankin* are inapplicable because they do not involve the escape statute. Instead, the State urges this court to interpret the escape statute by looking at section 5—130(5)(a) of the Juvenile Court Act of 1987, which defines the offenses for which juveniles can be prosecuted under the criminal laws. 705 ILCS 405/5—130(5)(a) (West 1998). Section 5—130(5)(a) of the Juvenile Court Act provides:

"(5)(a) The definition of delinquent minor under Section 5—120

of this Article shall not apply to any minor who is charged with a violation of subsection (a) of Section 31—6 or Section 32—10 of the Criminal Code of 1961 when the minor is subject to prosecution under the criminal laws of this State as a result of the application of the provisions of Section 5—125, or subsection (1) or (2) of this Section. These charges and all other charges arising out of the same incident shall be prosecuted under the criminal laws of this State." 705 ILCS 405/5—130(5)(a) (West 1998).

The State contends that when construed with section 5—120, section 5—130 provides the court with an instrument to prosecute delinquent juveniles as adults when the juvenile has been charged under subsection 31—6(a) of the escape statute. The State argues that if the escape statute does not pertain to juveniles, then section 5—130(5)(a) of the Juvenile Court Act would be rendered meaningless.

While the State is correct that the cases cited by Taylor, *In re W.W.*, 97 Ill. 2d 53, and *Rankin*, 297 Ill. App. 3d 818, do not involve the escape statute, the State fails to present any Illinois cases which hold that the Unified Code of Correction's definition for "conviction" includes juvenile adjudications. Based on the plain language of the statute, a "conviction" is an element of the offense of escape. Illinois courts hold that a juvenile adjudication is not a conviction. See *In re W.W.*, 97 Ill. 2d at 57; *Rankin*, 297 Ill. App. 3d at 825. If legislative intent can be ascertained from the statute's plain language, that intent must prevail without resort to other interpretive aids. *People v. Fitzpatrick*, 158 Ill. 2d 360, 364-65 (1994). The plain language of a statute provides the most reliable indicator of legislative intent, and we must not depart from the plain language of a statute by reading into it exceptions, limitations, or conditions that conflict with the express legislative intent. *Kingbrook, Inc. v. Pupurs*, 202 Ill. 2d 24, 29 (2002), quoting *Zimmerman v. Village of Skokie*, 183 Ill. 2d 30, 56 (1998), quoting *Barnett v. Zion Park District*, 171 Ill. 2d 378, 389 (1996).

The State urges this court to use sections 5—120 and 5—130 of the Juvenile Court Act as interpretive aids, but we decline to follow the State's recommendation and will use, instead, the plain language of the escape statute. Under the plain language of the escape statute, Taylor, a minor who had been adjudicated delinquent in a juvenile proceeding, is not "a person convicted of a felony" or a person "charged with the commission of a felony" and, therefore, cannot aid and abet in the commission of the offense of escape. Finally, the legislature cannot convert Taylor's juvenile adjudication into a felony conviction, or manipulate the State's burden of proof on an element of the offense of escape (the State must prove Taylor had a felony conviction), by promulgating legislation which provides that the definition

for delinquent minor does not apply to any minor charged with the offense of escape.

## CONCLUSION

 In conclusion, we find that the plain language of the Criminal Code precludes the prosecution of juveniles for the offense of escape when the juvenile has not been convicted of a felony. Therefore, Taylor, who was adjudicated delinquent, could not be found guilty of the offense of escape as a matter of law. Accordingly, we hereby reverse Taylor's convictions for aggravated battery, aggravated unlawful restraint, and attempted escape. In light of this disposition, we need not address the other issues raised in this appeal.

For the aforementioned reasons, we reverse Taylor's convictions and sentence.

Reversed.

CAMPBELL, P.J., and O'BRIEN, J., concur.