NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2021 IL App (4th) 190584-U

NO. 4-19-0584

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
September 14, 2021
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court |
| v. | ) | of Piatt County |
| DEANGELO L. WILLIAMS, | ) | No. 18CF43 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Jeremy Richey, |
| | ) | Judge Presiding. |

PRESIDING JUSTICE KNECHT delivered the judgment of the court.
Justices Harris and Steigmann concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The evidence was sufficient to prove beyond a reasonable doubt defendant
knowingly possessed the methamphetamine and cocaine found in the vehicle he
rented shortly before his arrest.

¶ 2    After a bench trial, defendant, Deangelo L. Williams, was convicted of unlawful

possession of methamphetamine with intent to deliver (720 ILCS 646/55(a)(1), (2)(B) (West

2018)), unlawful possession of a controlled substance with intent to deliver (cocaine) (720 ILCS

570/401(c)(2) (West 2018)), and unlawful possession of a controlled substance (cocaine) with

intent to deliver with a prior conviction for unlawful delivery of a controlled substance (720

ILCS 570/402(c) (West 2018)). On two of the counts, defendant was sentenced to concurrent

terms of six years' imprisonment. Defendant appeals, arguing the State failed to prove him guilty

beyond a reasonable doubt as the evidence was insufficient to show he knowingly possessed the controlled substances. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4        In May 2018, defendant was arrested after 13.6 grams of cocaine and 5.1 grams of pills containing methamphetamines were found in a stalled vehicle he had been driving. Defendant did not own the vehicle. He was charged with the above-listed offenses.

¶ 5        In May 2019, a bench trial was held on those charges. The State's first witness was Justin Ernst, a deputy with the Piatt County Sheriff's Office and the arresting officer. On May 21, 2018, at approximately 9:30 p.m., Deputy Ernst was dispatched to Interstate 72 to assist a motorist. When Deputy Ernst arrived at the vehicle, he found a vehicle straddling the fog line in the roadway. Deputy Ernst passed the vehicle and parked in front of it. He observed a male, defendant, walking toward the vehicle. Deputy Ernst approached defendant, who mentioned he and his girlfriend, Shamya Murphy, were returning from Chicago. Murphy was not, however, at the vehicle when Deputy Ernst arrived.

¶ 6        According to Deputy Ernst, defendant "appeared rather worked up for his car being out of gas." Defendant's voice and demeanor prompted the feeling "something else was going on there." Deputy Ernst's first priority was to get the stalled vehicle off the roadway. He stood near the driver's side door as defendant opened the door. Defendant was unable to find the keys. Defendant said Murphy, who had been driving, may have taken them with her. At this point, Deputy Ernst observed a plastic bag on the rear floorboard, behind the front passenger seat. Deputy Ernst explained what happened next:

"Q. Now you said that once you had—you saw the

substance—the hard yellow substance on the rear passenger floorboard, you asked the defendant what the substance was. What, if anything, did he do once you asked him about that?

A. Denied knowledge.

Q. Did he do anything physically?

A. Yeah, he bent down and hit his head on the driver's side window.

Q. When—did you—once you saw him lean over and hit his head on the driver's side window, when you say that, was he facing the driver's side of the vehicle when he did that?

A. I don't remember which way he was facing, but I know he did it with the side of his head.

Q. Once you saw this substance, what if anything did you do with defendant at that point?

A. After he slammed his head against the window, I placed him in handcuffs for his safety and mine."

¶ 7 After placing a handcuffed defendant in the rear seat of the squad car, Deputy Ernst retrieved the plastic bag from the floorboard. He searched the vehicle and found additional contraband: "I located another bag about the same, and then I believe there was another baggy, three other baggies in the passenger side pocket door—the pocket." Deputy Ernst agreed the area where he found "other baggies" was commonly referred to as the map pocket on the door. Two bags contained a hard, yellow substance. The second bag was found between the seat and the

seat belt, near the "A-pillar" on the passenger side. The baggies in the map pocket contained various colored pills. Deputy Ernst found $199 in cash on defendant's person.

¶ 8 Deputy Ernst testified efforts were made to locate Murphy. A Monticello police officer went to the area. Others attempted to contact her by phone. She was not located.

¶ 9 On cross-examination, Deputy Ernst testified it was dark when he approached defendant and the vehicle. Traffic was light. The only artificial light originated from Deputy Ernst's squad car and passing headlights. For the most part, the vehicle was stopped in an area surrounded by farm fields. From the time Deputy Ernst observed defendant walking toward the vehicle, he did not observe defendant run or attempt to conceal or throw anything. Defendant complied with the deputy's request to attempt to start the vehicle or put it into neutral. Deputy Ernst first saw contraband when defendant opened the door to try to start the vehicle.

¶ 10 Deputy Ernst testified the second bag with the hard yellowish substance was found next to the seat. It was concealed from the driver's side view. If the passenger was "reaching down to get a seat belt, you know, you could've seen it." When questioned that was a "[p]retty tight squeeze," Deputy Ernst testified "[h]e should've seen it." The other items in the map pockets were "[m]ore narcotics." He did not recall trash or debris in the map pocket, and he testified the map pocket was open at the top and two to three inches deep. The vehicle was not registered to defendant.

¶ 11 Deputy Ernst was unable to tell the distance between the Ford Taurus and the residence of Jill Lubbers. Deputy Ernst had received radio traffic reports of a female walking on Interstate 72 and seeking assistance. He recalled defendant had told him he and Murphy were returning to Decatur after having purchased a pit bull puppy in Chicago. No attempts were made

to find fingerprints on the plastic bags found in the car. Two cell phones were found in the vehicle. The phones were not searched.

¶ 12    The parties stipulated 13.6 grams of cocaine and 20 tablets containing 5.1 grams of methamphetamine were found in the vehicle.

¶ 13    Jill Lubbers testified she resided in a house on the north side of the interstate. "Multiple times over the years," individuals approached her house needing assistance for car problems. During the evening of May 21, 2018, defendant knocked on her door. Defendant explained he had run out of gas on the interstate. Lubbers told him she had no fuel for his vehicle but she would call the sheriff's department and ask them to assist defendant. Defendant said he did not have insurance. Lubbers told him "they don't care if you don't have insurance, they'll come and help you anyway." Defendant headed back to his vehicle.

¶ 14    On cross-examination, Lubbers testified she lived in a rural area. There was one other house on the other side of the interstate, and it was vacant. The crops had not grown in the fields. There was a lot of vacant dark farmland around her house. Lubbers stated at her house there were five steps to walk up to her porch. There was a little rock garden. Lubbers agreed there were plenty of places to hide things. Lubbers did not recall if defendant asked to use her phone to call someone to pick him up. Lubbers watched defendant walk back toward his car.

¶ 15    Chad Ramey, a detective with the Decatur Police Department, testified as an expert in narcotics distribution. According to Detective Ramey, a "dosage unit" of crack cocaine was approximately 0.2 grams, about the size of a pencil's eraser. The street value for one dose was roughly $20. The amount of cocaine found in the vehicle contained around 65 doses. The street value for the methamphetamine pills was $5 to $10 per pill. Detective Ramey opined

defendant intended to deliver the drugs in his possession based upon a number of factors. First, the amount of crack cocaine seized indicated defendant intended to deliver the cocaine. When sold for personal use, crack cocaine was sold in $20 rocks. Detective Ramey acknowledged someone could purchase one gram for personal use "to get their money's worth." Second, there was no evidence of pipes used to smoke crack or any other drug paraphernalia. Third, currency was found on defendant. Detective Ramey acknowledged the amount found was only $199, but the fact there was cash indicated an intent to deliver. In addition, methamphetamine users typically purchased 1 to 6 pills at a time, while 20 were found in the vehicle.

¶ 16      On cross-examination, Detective Ramey testified most people did not carry $199 dollars. He agreed other factors tended to show whether the amount of a controlled substance was indicative of an intent to deliver. Those factors included the presence of scales and possibly weapons. Detective Ramey agreed he did not know if scales or weapons were recovered. Detective Ramey testified for drug dealers it would "[m]ost definitely" be helpful to obtain a search warrant to look at a suspect's cell phone. When asked how often drug dealers called the police for assistance, Detective Ramey testified, "Not a lot. I've seen some weird things throughout the years, but not a lot."

¶ 17      Defendant testified on his own behalf. Defendant resided in Decatur, Illinois. He worked at Helping Hands New Beginnings. Defendant did not have a bank account. When he received his paycheck, he would cash it and put the funds in his pocket. Defendant used cash. He did not use a debit or credit card.

¶ 18      On May 21, 2018, defendant left town to purchase a puppy. He found a puppy on Craigslist that was located on the southside of Chicago. Defendant did not own a vehicle.

Murphy, however, knew someone named "Kimbre," who rented her car to others. Defendant had rented Kimbre's car two or three times before. Defendant and Murphy gave Kimbre $40 to take the car for a few hours. They picked up the car in the afternoon. The car was messy. There were fast-food wrappers "and stuff like that" in the car. Defendant could not remember the shade of gray of the car's interior. The windows were tinted. Defendant had approximately $300 and Murphy had money as well. They stopped at a gas station as they were leaving town. Murphy drove most of the time. Because Murphy would not drive in Chicago, they switched seats along the way.

¶ 19 Upon arriving in Chicago, they first stopped at another gas station. They then went to purchase the puppy. That stop lasted approximately five minutes. Defendant paid $100 for the puppy. They then began the return to Decatur. Defendant and Murphy took turns driving. The puppy sat on the laps of both Murphy and defendant. Neither was in the back seat of the vehicle. Defendant did not look in the map pockets in the doors.

¶ 20 At some point in Piatt County, the car stopped accelerating. Defendant was in the passenger seat. Murphy got the car partially onto the shoulder. At the time, it was completely dark. Traffic was slow. "[L]ike every few minutes or whatever," they would see another car. The batteries on both cell phones were dead. Murphy and defendant tried to flag down assistance. Defendant believed someone might help a female before they would help him, so he told Murphy to walk down the road to try to get help. Defendant saw a house in the distance and began walking toward it. It took at least ten minutes to walk there.

¶ 21 At that house, defendant encountered Lubbers. She offered to call the sheriff's office. He knew an officer was coming. Defendant walked back to the car. He did not run. As he

got closer to the car, the squad car arrived.

¶ 22        After Deputy Ernst arrived, defendant entered the car to show the deputy it would not start. Defendant could not, however, locate the keys. At this point, Deputy Ernst observed crack cocaine in the vehicle. Defendant denied knowing it was there. Defendant denied seeing the methamphetamine pills in the map pockets. He denied being a drug dealer. Defendant did not go in the back seat or open either of the rear doors. Defendant banged his head on a window when Deputy Ernst showed him the baggy with the crack cocaine because defendant did not know it was there.

¶ 23        On cross-examination, defendant testified Kimbre's car was always "kind of messy." The other times defendant rented Kimbre's car was to use it around Decatur.

¶ 24        At the close of evidence, the trial court found the State proved defendant guilty beyond a reasonable doubt. The court agreed the case turned on the question of whether defendant knowingly possessed the substances and found the evidence established he did:

> "[T]here was only one person around the borrowed car[ ]
> when the deputy arrived. There was nobody in the car, but the only
> person near the car was the defendant. There [were] drugs found
> inside the car, in different locations, but all of those locations were
> within reach of the—within the defendant's reach. The defendant
> was not just in the passenger side. He was in the driver's side as
> well. So he was in multiple locations of the car and those drugs
> were always, at different times, within his reach. And he was in
> fact in control of the car at different times. At times he was a

passenger but other times he was actually in control and driving that car. We aren't dealing with small amounts here, We're dealing with dealer amounts of drugs, different locations in this car. Based upon the testimony as to the value, it's hard to believe that somebody would just leave that amount of drugs in the car. There were separate baggies, different types of drugs. There was both cocaine and methamphetamine. The pills are of different colors for the methamphetamine. The cocaine was in two separate bags, roughly the same. When reviewing the pictures of the money, even though it wasn't an amount of money in the thousands of dollars, the court would note that the pictures do show that there are mostly small bills, mostly twenties. I see [nine] twenties, two fives, and it looks like maybe five ones—all small amounts of bills that are consistent with drug dealing. The defendant was observed beating his head against the window. He was observed to be rather wound up. His testimony was not credible."

¶ 25    The trial court sentenced defendant to concurrent terms of six years' imprisonment on two of the counts. The court determined the two charges concerning cocaine had merged. This appeal followed.

¶ 26                                II. ANALYSIS

¶ 27    Defendant argues the State failed to prove him guilty beyond a reasonable doubt as the State failed to prove he knowingly possessed the controlled substances found in the

vehicle he rented a few hours before his arrest.

¶ 28　　　　　When a defendant challenges the sufficiency of the evidence to support his criminal convictions, we consider the evidence "in the light most favorable to the prosecution" and determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *People v. Ward*, 215 Ill. 2d 317, 322, 830 N.E.2d 556, 559 (2005). The standard of review applies to all criminal cases, "whether the evidence is direct or circumstantial." *People v. Maggette*, 195 Ill. 2d 336, 353, 747 N.E.2d 339, 349 (2001). In performing this task, our review is of the record as a whole and not simply of the evidence supporting the State's theory of the case. See *People v. Wheeler*, 226 Ill. 2d 92, 117-18, 871 N.E.2d 728, 742 (2007). We are mindful it is the function of the factfinder to assess witness credibility, weigh the evidence, resolve conflicts in that evidence, and draw reasonable inferences therefrom. *People v. Moss*, 205 Ill. 2d 139, 164, 792 N.E.2d 1217, 1232 (2001). This court will not reverse a conviction unless the evidence is so unsatisfactory or improbable it creates a reasonable doubt of the defendant's guilt. See *id.* at 165.

¶ 29　　　　　Here, defendant was convicted of three offenses involving the unlawful possession of controlled substances: unlawful possession of five grams or more but less than 15 grams of a substance containing methamphetamine (720 ILCS 646/55(a)(1), (2)(B) (West 2018)), unlawful possession of one or more but less than 15 grams of cocaine with intent to deliver (720 ILCS 570/401(c)(2) (West 2018)), and unlawful possession of a controlled substance (cocaine) with a prior conviction for unlawful delivery of a controlled substance (720 ILCS 570/402(c) (West 2018)). To prove defendant guilty of these offenses, the State had to prove defendant possessed the controlled substances. This requires proof defendant knew of the

presence of the controlled substances and had " 'immediate and exclusive power over them.' " *People v. Scott*, 2012 IL App (4th) 100304, ¶ 19, 966 N.E.2d 340 (quoting *People v. Morrison*, 178 Ill. App. 3d 76, 90, 532 N.E.2d 1077, 1086 (1988)). Because the evidence establishes defendant was not alone in the vehicle at issue, we note "that possession must be exclusive does not mean that the possession may not be joint." *People v. Schmalz*, 194 Ill. 2d 75, 82, 740 N.E.2d 775, 779 (2000).

¶ 30 A defendant's possession of a controlled substance may be actual or constructive. *Scott*, 2012 IL App (4th) 100304, ¶ 19. "Actual possession is the exercise by the defendant of present personal dominion over the illicit material[.]" *Schmalz*, 194 Ill. 2d at 82. In contrast, constructive possession exists when one has the intent and capability of maintaining control and dominion. *Scott*, 2012 IL App (4th) 100304, ¶ 19. Evidence to establish constructive possession is often wholly circumstantial. *Id.*; see also *People v. Frieberg*, 147 Ill. 2d 326, 361, 589 N.E.2d 508, 524 (1992) ("Where narcotics are found on premises under the defendant's control, it may be inferred that he had the requisite knowledge and possession, absent other facts and circumstances which might leave a reasonable doubt as to guilt in the minds of the jury."). The State may prove knowledge and possession with evidence of "defendant's acts, declarations, or conduct from which it can be inferred he knew the contraband existed in the place where it was found." *People v. Beverly*, 278 Ill. App. 3d 794, 798, 663 N.E.2d 1061, 1064 (1996).

¶ 31 Defendant points to *People v. Bailey*, 333 Ill. App. 3d 888, 889, 891-92, 776 N.E.2d 824, 825, 827 (2002), a case involving a defendant convicted of the aggravated unlawful use of a weapon, for factors from which constructive knowledge could be inferred. Such factors include the following: "(1) the visibility of the weapon from [the] defendant's position in the car,

(2) the period of time in which the defendant had an opportunity to observe the weapon, (3) any gestures by the defendant indicating an effort to retrieve or hide the weapon, and (4) the size of the weapon." *Id.* at 891-92. Defendant emphasizes *Bailey*'s conclusion "[a] defendant's mere presence in a car, without more, is not evidence that he knows [contraband] is in the car." *Id.* at 891. Defendant argues consideration of these factors show the State's evidence fails to establish he knew the drugs were in the car. He emphasizes the windows were tinted, the rear of the car was littered with fast-food packaging, and there was no testimony the pills in the map pocket were in plain view. Defendant points to the fact although he was in the car for several hours, this time period did not imply defendant knew the drugs were in the car. Defendant contends he changed seats multiple times with Murphy, shortening the time he had to notice the drugs wedged between the seats. Defendant further maintains the other facts do not support the inference of the drugs. Defendant contends the fact he hit his head on the window was due to frustration at the presence of drugs found in the car that did not belong to him. He further points to the opportunity to discard the drugs in the fields and there was no evidence he attempted to flee or hide evidence, even after he knew the sheriff's office had been called.

¶ 32        We find the State produced sufficient evidence from which to infer defendant had knowledge of the drugs in the car. Defendant was a driver and a passenger in the car during the trip to Chicago and the return to Decatur. The trip began during daylight hours. According to his own testimony, defendant entered and exited the vehicle on multiple occasions to pump gas and to purchase the puppy. The cocaine in the back seat was in plain view by Deputy Ernst as soon as defendant entered the car after Deputy Ernst's arrival, even though it was night. The cocaine "should've been seen" from the passenger seat, a seat in which defendant admitted sitting. The

- 12 -

amount of the drugs and the value of those drugs make it unlikely someone left the drugs in the car before defendant rented it. Although there is no evidence defendant was observed attempting to conceal the contraband, defendant attempted to dissuade Lubbers from calling authorities by stating he had no insurance. In addition, while nervousness is not alone sufficient to uphold a finding of knowledge, defendant's behavior observed by Deputy Ernst supports a finding of knowledge. See *People v. Canizalez-Cardena*, 2012 IL App (4th) 110720, ¶ 15, 979 N.E.2d 1014 ("Nervousness is not in and of itself sufficient to uphold a finding of knowledge, but it 'does weight in favor of a finding of knowledge.' ") (quoting *People v. Ortiz*, 196 Ill. 2d 236, 266-67, 752 N.E.2d 410, 429 (2001)). The evidence further shows defendant had a physical reaction, banging his head on the car window, when Deputy Ernst asked about the cocaine. These facts, when viewed in the light most favorable to the prosecution, establish "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *People v. Ward*, 215 Ill. 2d 317, 322, 830 N.E.2d 556, 559 (2005).

¶ 33        Defendant additionally argues the trial court, in finding him guilty, improperly considered that the money found on defendant was "small amounts of bills" and the existence of small bills was "consistent with drug dealing," as this was a fact not in evidence. In his opening brief, while arguing the evidence at trial was insufficient to establish constructive knowledge, defendant simply asserted the trial court improperly considered the fact the money found on defendant was "small amounts of bills that are consistent with drug dealing." Defendant maintained the conclusion was unsupported by the record, as Detective Ramey did not so testify, and, therefore, should not have been considered when assessing his guilt. Defendant cited one case in support of his argument, with the following quoted language in a parenthetical: "During a

bench trial, a trial judge's deliberations are limited to the record made before him or her during the course of the trial." (Internal quotation marks omitted.) *People v. Moon*, 2019 IL App (1st) 161573, ¶ 28, 138 N.E.3d 208. In his reply brief, however, defendant argued he was denied due process because of this error and was entitled to reversal on this ground. Defendant then argued extensively his right to due process was denied when the trial court considered evidence not admitted during his trial, developing legal argument and citing multiple cases in support of his argument.

¶ 34 Defendant's failure to argue he was denied due process in his opening brief results in forfeiture of his claim. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020). Illinois Supreme Court rules require the argument section of an appellant brief contain the appellant's contentions "and the reasons therefor, with citation of the authorities and the pages of the record relied on." *Id.* This requirement is not satisfied by mere allegations of error or citation to irrelevant authority. See *Vancura v. Katris*, 238 Ill. 2d 352, 370, 939 N.E.2d 328, 340 (2010) ("An issue that is merely listed or included in a vague allegation of error is not 'argued' and will not satisfy the requirements of the rule."); see also *People v. Phillips*, 215 Ill. 2d 554, 565, 831 N.E.2d 574, 581 (2005) (finding an argument forfeited due to appellant's failure to support his assertion with argument or cite relevant authority). Here, the opening brief does not contain an allegation or authority to support the claim raised in the reply brief that defendant was denied due process by the trial court's consideration of evidence not introduced at trial. Defendant's opening brief fails to mention "due process." At best, one can see how defendant's opening brief argument could be read to include a denial-of-due-process type of argument, but there is no argument or authority showing the trial court's error in considering this non-admitted "fact" in a list of reasons

- 14 -

supporting the finding of guilt is reversible error. Defendant has forfeited this claim. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) ("Points not argued are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing."). We note this court did not consider this "fact" when evaluating defendant's challenge to the sufficiency of the evidence against him.

¶ 35                                    III. CONCLUSION

¶ 36          We affirm the trial court's judgment.

¶ 37          Affirmed.